Allison "Pookie" FORTIN et al.,
Plaintiffs-Appellants,

v.

DARLINGTON LITTLE LEAGUE,
INC., etc., et al., Defendants-Appellees.

No. 74–1216.

United States Court of Appeals,
First Circuit.

Argued Oct. 9, 1974.

Decided March 31, 1975.

Stephen J. Fortunato, Pawtucket, R. I., with whom McKinnon & Fortunato, Pawtucket, R. I., was on brief, for Allison "Pookie" Fortin and Robert Fortin, appellants.

William J. Burke, Jr., Pawtucket, R. I., with whom William P. Butler, Pawtucket, R. I., was on brief, for appellees.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

This case concerns the right of a girl to play Little League baseball. In the spring of 1974, ten year old Allison "Pookie" Fortin and her father went to Slater Field, a City of Pawtucket park, where Pookie sought to participate in the baseball program of the Darlington Little League, Inc., American Division ("Darlington").[1] Pookie was a Pawtucket resident and otherwise eligible; she was turned down because of her sex. Defendant McCluskie, president of Darlington, told the Fortins that a boys-only policy was dictated by the national Little League organization. *See* note 1, *supra*. If Pookie were accepted, McCluskie feared that Darlington's Little League charter would be revoked, and the inexpensive insurance provided by the national organization lost.

After she was rejected, Pookie and her father brought suit under 42 U.S.C. § 1983 and related statutes against Darlington and McCluskie and also against Dragon, Pawtucket's Director of Parks and Recreation, who maintains Slater Field and controls permission to use its

---

1. Darlington was chartered in 1956 under Rhode Island law as a non-business corporation for the purpose of "guiding the youth of our community through the ages of eight (8) to thirteen (13) in the wholesome recreation of Little League Baseball". It holds a Certificate of Charter to conduct a local Little League program from Little League Baseball, Inc., a national corporation created by special Act of Congress. When this case was before the district court, the legislation under which the national organization was formed provided for participation only by boys. Pub.L. 88–378, 78 Stat. 325 (1964). That limitation has since been eliminated. *See infra.*

baseball diamonds.[2] They asserted that denying Pookie the same places of public accommodation and recreational activities as the male children of Pawtucket taxpayers enjoy violated the equal protection clause of the fourteenth amendment. Plaintiffs requested a declaration and injunction allowing Pookie to play on the same terms as boys.

After trial, the district court denied any relief. It held[3] that while Darlington's preferential use of a municipal park involved it significantly with the state—thereby rendering Darlington's policies subject to the fourteenth amendment—its exclusion of girls was "rational" and hence constitutional. In the court's view, if girls were to play a "contact" sport like baseball with boys, there was a serious risk that the girls would be hurt.

■ Since this appeal was argued, Congress has enacted and the President has signed into law H.R. 8864, amending the Act to incorporate Little League Baseball, Pub.L. 88–378. Pub.L. 93–551, 88 Stat. 1744 (1974). The amendment struck the words "boys" and "manhood" from the national charter, inserting the words "young people". The Report of the House Committee on the Judiciary announced that the legislative purpose was "to amend the Federal Charter of Little League Baseball, Inc., to allow girls to participate on an equal basis with boys." H.R.Rep. No. 93–1409, 93d Cong., 2d Sess. 1 (1974). The Report went on to state that

"Young girls, although they may have desired to play Little League Baseball, in the past were prohibited . . .. Over the years frustration developed until, in 1974, these young girls, through their parents, sought to participate in this activity by petitioning the courts for equal opportunities to play Little League Baseball. Twenty-two class action suits were filed across the country. . . .

"It was while many of these lawsuits were pending that the Little League Baseball organization petitioned Congress to amend their Federal charter to include girls in this far-reaching program. This fine organization . . . will now be expanded to include all of our young people. With this change in their charter, we can look forward to unhindered local Little League programs, where boys and girls can play side-by-side.

"Stressed during the hearing on the amendment to this Federal charter was the intent of Congress that this federally chartered organization should treat girls equally with boys, and that Congress would not tolerate separate but equal programs. . . .

"The proposed legislation, as amended, will accomplish the goal of girls' participation on an equal basis with boys in Little League Baseball, Inc."

Id. at 2. After enactment of H.R. 8864, this court asked the parties if the appeal had become moot. While the Act does not directly compel local groups to admit girls, Darlington's purported reliance upon the national charter to exclude Pookie led us to imagine that the controversy was at an end. However, Darlington has pointedly refused to give assurance of a change of heart. We conclude that the case is not moot and that the parties are entitled to a decision.

## I

Pookie's claim is made under the fourteenth amendment of the Constitution which provides "No state shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its juris-

2. Charles Shea, Superintendent of Schools in Pawtucket, was also named a defendant. It was alleged that Shea had allowed Darlington to use the city's schools to promote Little League activities and recruit players. At the trial, evidence was adduced that Shea had allowed other local Little League groups, but not Darlington, to use school facilities. The court dismissed the complaint against Shea. If the issue is still alive, we affirm the dismissal as to him.

3. 376 F.Supp. 473 (D.R.I.1974).

diction the equal protection of the laws." As the equal protection clause "applies only to action by state government or officials and those significantly involved with them", Adickes v. S. H. Kress & Co., 398 U.S. 144, 189, 90 S.Ct. 1598, 1619, 26 L.Ed.2d 142 (1970) (Brennan, J., concurring), plaintiffs must demonstrate that Darlington's formally private practices are "so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." Evans v. Newton, 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373 (1966).

Thus, in accordance with the well known formulation in Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), the district court undertook to sift facts and weigh circumstances to determine whether the exchange of benefits between the City of Pawtucket and Darlington held the latter "to the same duties of observance of constitutional rights as are imposed upon a government unit." McQueen v. Druker, 438 F.2d 781, 784 (1st Cir. 1971).

The district court found that the Slater Park diamonds, laid out and maintained by the City to Little League specifications, were primarily for the benefit of Darlington and only incidentally for other groups of youth and the general public; that they were made available at specific times for practice and games; that a new diamond was being laid out at City expense primarily for Darlington; that while others required diamonds of different dimensions, there was no evidence that the City of Pawtucket dedicated its resources to these groups on a scale approaching that afforded Darlington; that a significant proportion of the Slater Park diamonds are prepared to meet the needs of Darlington and other Little League groups; and that as a result of Darlington's use of diamonds five nights a week and on Saturdays throughout the baseball season, the general public is often precluded from utilizing the facilities. Furthermore, the court found it "implicit from the testimony of Joseph Dragon concerning the interest of the City of Pawtucket in the operation of baseball programs for its youth that to a certain extent [Darlington] by its recreational program is carrying on a governmental function." 376 F.Supp. at 478.

The court concluded that while there was no evidence that Pawtucket was involved in formulating Darlington's "no girls" policy, there was "significant" state involvement in Darlington's activities sufficient to subject them to the fourteenth amendment.

■ We find no error in this conclusion. While the "mere use" of city parks and playgrounds is not enough to clothe private groups with a public character for fourteenth amendment purposes, the rationing of otherwise freely accessible recreational facilities creates a "stronger case" for state action "than if the facilities are simply available to all comers without condition or reservation." Gilmore v. City of Montgomery, 417 U.S. 556, 574, 94 S.Ct. 2416, 2426, 41 L.Ed.2d 304 (1974). The dividing line runs somewhere between the "symbiosis" of state and private interests found in Burton, supra, and the mere receipt by a private entity of some sort of state benefit or service, as in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972).

■ Here the district court's supported findings of Darlington's heavy and preferred dependency upon city facilities place Darlington in the "symbiosis" category. While we do not go so far as to say that Darlington assumed a "governmental function", see Evans v. Newton, supra; Lavoie v. Bigwood, 457 F.2d 7, 14 (1st Cir. 1972), Darlington's extensive programs, occupying nightly six of eight city-kept diamonds, undoubtedly took on in the public consciousness a semi-official character, little different from recreational programs under direct City sponsorship. By supplementing the City's offerings, Darlington conferred a significant benefit upon the City that justified the City's return liberality as to facilities. Without intimating that lesser

utilization of city recreational facilities by a private entity would lead to the same result, we affirm the district court's state action finding.

## II

■ The district court next turned to whether Pookie's exclusion, based on her sex, violated the equal protection clause of the fourteenth amendment. The court said that "a classification based upon sex, race, alienage and national origin is inherently suspect and must therefore be subjected to close scrutiny." While the court's approach was broadly correct, its "inherently suspect-close scrutiny" language is more categorical than a majority of the Supreme Court has been willing to accept. It is true that three and possibly four of the justices have subscribed to Justice Brennan's view that gender-based classifications are subject to "close judicial scrutiny" and may "be sustained only if the government demonstrates that the classification served compelling interests that cannot otherwise be achieved." Schlesinger v. Ballard, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed. 610 (1975) (concurring opinion). But a majority of the Court, while rejecting gender-based classifications found to lack justification in fact, see Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), has declined to categorize gender on par with race and alienage as a "suspect" classification. Cf. Women's Liberation Union of Rhode Island v. Israel, 512 F.2d 106 (1st Cir. 1975). The current majority position seems to be that a sex-based classification denies equal protection in the constitutional sense unless shown to rest on a convincing factual rationale going beyond "archaic and overbroad generalizations" about the different roles of men and women. Schlesinger, supra, 419

U.S. at 508, 95 S.Ct. at 576. This is obviously a difficult test for a lower court to apply, since what is to one person "archaic and overbroad" may, to another, seem entirely sound. But it is in any event clear, as the district court recognized, that a burden now rests upon the proponent of any sex-based classification to demonstrate that there is a convincing reason, apart from convention, for its existence.[4]

The district court felt that Darlington met its burden by showing, as the court found, that

"there are material physical differences between boys and girls in the 8 to 12 age bracket regarding musculature, bone strength, strength of the ligaments and tendons, pelvic structure, gait and reaction time, and . . these differences could undoubtedly result in serious injuries to girls in said age bracket who participated in a contact sport such as baseball. . .

"The goal of safety is a legitimate concern of the defendant Darlington Little League, Inc. and this Court cannot say that its rule excluding girls between the ages of 8 to 12 years . . . is not rationally related to the effectuation of that reasonable goal." 376 F.Supp. at 479.

■ The parties were evidently of the opinion that the district court's assessment of the relevant physical differences between boys and girls, as well as its conclusion that these differences provided "rational" support for Darlington's exclusion of girls, were findings of fact within the meaning of Fed.R.Civ.P. 52(a). It was argued that if there is substantial evidence in the record supporting them, we must affirm. However, assessing such matters is not like reviewing a judgment in a personal injury case. The facts themselves, some-

---

4. Relief has been granted in a number of cases where sex-based restrictions upon participation in other sports has been challenged as unconstitutional. See, e. g., Brenden v. Independent School Dist. 742, 477 F.2d 1292 (8th Cir. 1973); Gilpin v. Kansas State High School Activities Assoc., Inc., 377 F.Supp. 1233 (D.Kan.1973); Haas v. South Bend Community School Corp., Ind., 289 N.E.2d 495 (1972); but cf. Bucha v. Illinois High School Assoc., 351 F.Supp. 69 (N.D.Ill.1972).

times labelled "legislative" or "constitutional" facts, are not "provable" in the usual sense and are part and parcel of the constitutional judgment we ourselves must make. *Cf.* Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) (*quoting* Watts v. Indiana, 338 U.S. 49, 51, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949)); Note, The Presentation of Facts Underlying the Constitutionality of Statutes, 49 Harv.L.Rev. 631, 638–39 (1936). Reviewing the facts in this context, we are of the view that the court's conclusion is not supported, and for reasons hereafter stated we reverse. First, however, we briefly summarize the evidence presented at the trial:

1. Pookie's father, a physician, testified that she was "physically fit and able to play baseball."

2. The Little League program she would have entered, had Darlington accepted her, was shown to sponsor three tiers of teams, accommodating players of different levels of maturity and ability. Younger boys, 8–9, play on the so-called minor league teams, of which there are eight. There are also several instructional league teams for boys of lesser ability. Boys of 10–12 are "drafted" into the seven Little League teams, although some older boys may never reach that level if they lack the ability. Darlington has a policy of accepting physically handicapped boys, placing them in teams and positions suited to their skills.

3. Darlington presented the deposition of Dr. Crane, an orthopedist who treated Brown University teams and who also had coached Little League baseball. Ninety percent of his experience with athletes had been with males. Dr. Crane felt the average girl could not safely compete with boys, although there might be some exceptions. His opinion seems to have rested mostly on the observation that girls, being more sedentary, were likely to be in poorer condition than boys. However, he also felt that girls, by reason of the design of their pelvis, walked with more unstable gait; that girls lacked the capacity to throw overhand; and that girls might be more likely to sustain bone-end fractures since they would be growing faster than boys during the 8–12 period.

4. Plaintiffs' main expert, Dr. Mathieu, was a board certified pediatrician who was medical director of the City of Providence School Department. She felt girls of Little League age could safely play baseball with boys. She testified that girls 8–12 are generally larger and as strong or stronger than boys of a similar age. They are no more subject to fractures or other injuries, no more unstable on their feet, are neurologically similar, and have the same amount of fat. The only notable physical difference at these ages is that girls have a lesser respiratory capacity, although Dr. Mathieu did not believe the difference would affect their ability to play baseball.

5. A radiologist called by plaintiffs testified that girls' bones are no different from boys', and that skeletally girls are no more subject to injury or unstable.

6. The president and coaches of Darlington testified to a belief that girls would detract from the game; might cause boys to play less aggressively and more protectively; had a lower "boiling point"; would be more prone to injury and, if in need of first aid, would embarrass the male coaches; and would prefer to play with other girls.

7. Darlington's only witness with experience with mixed teams said that boys on his teams had been encouraged to hold back because girls were less able to protect themselves. He thought that girls were injured more often than boys.

We find this evidence meager support for the court's finding of "material physical differences . . . regarding musculature, bone strength, strength of ligaments and tendons, pelvic structure, gait and reaction time . . . that . . . could undoubtedly result in serious injuries to girls . . .."

Dr. Crane, it is true, deposed that boys generally were stronger, being, he thought, more active. His basis for comparison, however, was entirely impressionistic.[5] He admitted never having observed girls playing baseball and to a medical practice with emphasis upon male patients. He further agreed, with only a few qualifications, that the bones and bodies of girls were essentially as resistant to blows as those of boys, and that girls from 10–12 would experience a growth spurt ahead of boys. No statistical data whatever was presented tending to show greater female than male susceptibility to injury in the 8–12 group, and it is difficult to tell how much of Dr. Crane's deposition rested on personal views, to which he admitted, that it was the normal activity of a young lady to keep off baseball fields and play with dolls, and how much on science.

The court, moreover, gave no reason for totally rejecting the contrary testimony of Dr. Mathieu, a pediatrician with excellent credentials who would seem to have had more chance to examine children of both sexes in the relevant age groups than Dr. Crane. As Dr. Crane testified only through deposition, it is hard to see why his testimony should receive dispositive weight.

Darlington, moreover, accepts boys of all degrees of physical condition, including handicapped boys. Even Dr. Crane believed that a few girls could compete at the level of boys, and it is reasonable to suppose that handicapped and unathletic boys would be less proficient than many girls. Girls found to lack conditioning or ability to play safely could, like similarly situated boys, be retained on instructional or junior league teams rather than advanced to little league teams.

In addition, it seems most unlikely that a girl's parents would encourage or permit her to participate—or that the girl would wish to participate—in a program found to be too fast or rough for her. Should girls find Little League baseball too demanding, the problem would seem self-regulating in that the girls would withdraw.

Finally, we take notice not only that girls have for some time played Little League baseball in many communities but that Congress has amended the national Little League charter for the express purpose of encouraging and permitting girls to play on equal terms with boys. To uphold the district court would require us to accept the likelihood that both the policy in other communities and the judgment of Congress have resulted or will result in disproportionate physical injury to girls. We cannot conceive of Congress consciously adopting, and the Little League accepting, a policy likely to result in widespread injury; indeed Congress' action implies a finding by that body that girls are capable of playing Little League baseball without undue risk.[6] The amendment of course removes Darlington's worry as to the availability of insurance for girl players.

■ We conclude that the court's stated reason for finding Darlington's exclusion of girls "rational"—namely, that in-

---

5. Even if Dr. Crane's testimony were "not entirely without empirical support," it represents the sort of "gender-based generalizations [which] cannot suffice to justify" the categorical exclusion of girls. *See* Weinberger v. Wiesenfeld, —— U.S. ——, ——, 95 S.Ct. 1225, 1231, 43 L.Ed.2d 514 (1975).

6. In its report the House Committee on the Judiciary noted that,

"There had been a tendency for [the national Little League Baseball organization] to assume that little girls were not capable of competing with young boys their own age.

The Committee felt that young girls should not only be given the opportunity to play Little League Baseball but should be encouraged to participate in this meaningful activity."

H.R.Rep. No. 93–1409, 93d Cong., 2d Sess. 2 (1974). On the relevance of congressional factfinding to the application of the fourteenth amendment, see Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966). *But cf.* Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970).

jury will undoubtedly occur due to the physical differences between boys and girls—is unsupported. Our decision relates, of course, solely to the age group in question. It seems likely that as girls and boys mature, greater physical differences affecting athletic ability exist. But the evidence is essentially uncontroverted that the years 8–12 are those during which girls come close to matching boys in size and physical potential.

 The other reasons cited by Darlington, the alleged preferences of coaches and players, the sense of what is or is not fit for girls to do, and the like, seem to us inadequate reasons to deny Pookie an opportunity to play on equal terms. These fall more under the heading of those "archaic and overbroad generalizations" rejected by the Supreme Court. Other arguments, such as that girls do not deserve an opportunity since later they will move in other athletic channels, do not impress us as justifying their exclusion during the years that they possess essentially equal capacity to enjoy this healthy and beneficial form of recreation. See National Organization for Women v. Little League Baseball, Inc., 127 N.J.Super. 522, 318 A.2d 33, 38–39 (1974). Darlington, we recognize, is staffed by volunteers who, it is asserted, do not wish to coach girls. But while Darlington could adopt any policy it wishes if it did not rely on the large-scale use of city facilities, the latter factor impresses it with the City's duty to deal equally.

Central to our decision, of course, are such factors as the ages of the children concerned, the uniqueness of the opportunity, and recent congressional assessment of the situation. Nothing we say is meant to preclude recognition of bona fide distinguishing factors between the sexes in some sports at some ages and in some circumstances.

The judgment of the district court is reversed and the case is remanded for entry of a suitable declaratory judgment and, if required, an injunction, in sub-stance requiring Darlington, so long as it continues to use City of Pawtucket parks and fields on the same or on a comparable basis as now, to admit the female plaintiff to its programs upon the same terms and conditions available from time to time to all others.

Reversed and remanded for action in accordance herewith. Costs to appellants, against appellee Darlington.