**Donald M. GOMES**

v.

**RHODE ISLAND INTERSCHOLASTIC LEAGUE, Rhode Island Secondary Principals' Association, Vincent Trainor, Jr., Superintendent of Schools for the City of Newport, Rhode Island, Charles Tobin, Principal of Rogers High School, Brian Burns, David R. Carlin, Jr., Patrick Francis Carroll, Louis T. Kazanjian, Charles R. Silvia, Arron Slom, George Herbert Triplett, in their capacities as Members of the School Committee of the City of Newport, Rhode Island.**

Civ. A. No. 79–0158.

United States District Court, D. Rhode Island.

May 1, 1979.

A. Lauriston Parks of Hanson, Curran & Parks, Providence, R. I., for plaintiff.

James F. McAleer, Providence, R. I., for R. I. Interscholastic League and R. I. Secondary Principals' Assoc. Co-counsel: Robert B. Mann, Providence, R. I., for defendants.

Albert B. West, Providence, R. I., for School Committee.

## OPINION

PETTINE, Chief Judge.

In recent years dozens of federal courts have interpreted the equal protection clause of the fourteenth amendment as mandating equal athletic opportunities for high school females. These rulings allowed girls to breach such previously all-male bastions as Little League baseball, high school soccer and cross-country skiing. *See, e. g., Fortin v. Darlington Little League, Inc.,* 514 F.2d 344 (1st Cir. 1975); *Brenden v. Independent Sch. Dist. 742,* 477 F.2d 1292 (8th Cir. 1973). *See also* 23 A.L.R.Fed. 661 at 664. There were only some minor limitations upon this athletic revolution: schools had a sufficiently strong interest in safety to prohibit co-ed participation in "contact" sports, "separate but equal" sports teams were permissible, and a reluctant school committee could always avoid such constitutional requirements by eliminating its athletic program completely. *See Hoover v. Meiklejohn,* 430 F.Supp. 164 (D.Colo.1977) (and cases cited therein).

Congress further assured athletic equality for females by passing Title IX of the Education Amendments of 1972. The statute broadly assures that no person "shall, on the basis of sex, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681. Regulations promulgated under the statute assure that Title IX covers such educational activities as high school athletics. 45 C.F.R. § 86.41. Responding to these judicial and legislative mandates, many schools now provide increased athletic opportunities for women.

The present case requires this Court to face the unique, if inevitable, corollary to such advances against sex discrimination: may a qualified male play on an all-girls athletic team when the high school offers

no separate male team. This issue is presented by a motion for a preliminary injunction filed by Donald Gomes, a senior at Rogers High School in Newport, Rhode Island, against the Rhode Island Interscholastic League, members of the Newport School Committee, and others. Gomes correctly premises his claim upon 42 U.S.C. § 1983 and alleges violations of Title IX and the fourteenth amendment. This Court need only decide the statutory issue.

There is little dispute that the actions of the defendants constitute state actions within the purview of 42 U.S.C. § 1983. The Rhode Island Interscholastic League is composed of various private and public schools, including Rogers High, and sponsors a variety of athletic events, formulates rules, and mandates certain sanctions. Such associations consistently have been held to be state actors and within the reach of section 1983. *See, e. g., Brenden v. Independent Sch. Dist., supra; Mitchell v. Louisiana High Sch. Athl. Assoc.,* 430 F.2d 1155 (5th Cir. 1970).[1]

The facts as presented at the preliminary injunction hearing were not vigorously contested.

Donald Gomes is six feet tall and sincerely desires to play volleyball. Donald had played on an all-boys volleyball team in Harrisburg, Pennsylvania, before being transferred to Rogers High. The sole reason Donald cannot play at Rogers High is his sex. The Rhode Island Interscholastic League does not provide interscholastic volleyball competition for males and disqualifies any team on which a male plays. There are a few all-girl private schools in the League; their teams are necessarily restricted to females. Some Rhode Island high schools field all-male volleyball teams which play outside the League's jurisdiction; Rogers High is not one of these schools.

Rogers High School does offer a wide variety of athletic opportunities for males. Women and men compete for positions on such teams as cross country, tennis, track, basketball, and baseball. Males constitute the overwhelming majority on those teams open to co-ed participation. The school also provides teams exclusively for females in tennis, track, basketball, gymnastics, volleyball, and softball. Thus a woman may choose to compete for a position on a co-ed tennis team or a position on the female tennis team; likewise, she may try out for the baseball team or the all-girls softball team. According to the league regulations adopted by the school, men are limited to the co-ed teams and, thus, may never participate in volleyball and gymnastics on a competitive basis. For safety reasons, women are not permitted to compete for positions on the all-male football team.

Not dissuaded by the League's rules, Donald tried out for and made the girls' volleyball team. He was the only male among the thirty-two individuals competing for the sixteen slots on the team. Apparently Donald's athletic interest was rather unique; the school's athletic director testified that there was not sufficient interest among the other boys at Rogers High to field a male volleyball team. Donald has been issued a uniform and has practiced steadily with the team but, because of his sex, he has not been allowed to play in the interscholastic games.

Despite Donald's size advantage over many of his female teammates, his coach, Mrs. Bryl Johnston, only ranks him between 9th and 6th in terms of comparative playing ability. Mrs. Johnson noted that girls volleyball rules differed in only one way from boys volleyball; *i. e.,* the net height is approximately seven inches lower in girls volleyball. Mrs. Johnston also testified that in her experience of teaching co-ed gym classes in volleyball, the playing skills of boys and girls have been relatively equal.

1. The actions of defendant school committee members are undeniably within the scope of 42 U.S.C. § 1983. Because section 1983 provides plaintiff with a cause of action, this Court need not reach the issue of whether Title IX independently provides an implied right of action. *See Cannon v. University of Chicago,* 559 F.2d 1063 (7th Cir.), *aff'd on rehearing,* 559 F.2d 1077 (1977), *cert. granted,* 438 U.S. 914, 98 S.Ct. 3142, 57 L.Ed.2d 1159 (1978).

She admitted, however, that if volleyball became a popular sport among high school boys, males would begin to dominate a co-ed team.

This last conclusion was strongly supported by medical and other expert testimony. Dr. Betty Mathieu, a pediatrician and the medical director of the Providence school system, cited a high school boy's greater muscle strength, endurance and height, and concluded that, at the high school level, boys would be an uneven match against girls in the sport of volleyball. Dr. Dorothy Harris, director of the "Women in Sports" Research Center at Penn State University, observed that persons with certain physical characteristics were more adept at playing certain sports. Because of men's greater muscle bulk, longer limbs and greater height, males generally could propel a volleyball with more force and better control. Due to these physical advantages, Dr. Harris believed that open competition among males and females would "virtually eliminate the opportunity" for girls to play such competitive sports as volleyball. Only the exceptional girl would become a member of an "open" or "co-ed" team. Despite the possibility of male domination, Dr. Harris did note that no physical harm could come to a female playing volleyball with or against a male. All the expert testimony and predictions of male domination were premised upon the assumption that volleyball would draw competitors from the general male high school population, not just from a few isolated boys. As with many medical experiments, a significant reduction of the applicant pool might affect the accuracy of the medical or athletic generalizations.

Deborah Chin, a world class volleyball player and college coach of the sport, agreed that open competition would seriously limit playing opportunities for girls. She noted that in co-ed volleyball, girls are relegated to secondary and defensive positions despite rules that assure an equal number of men and women on the court during play. Ms. Chin would not recruit or offer scholarship aid to a female on a co-ed team because such a player is likely to have severely limited offensive skills.

Ms. Chin, among others, described the various skills required to play volleyball. She testified that volleyball was a well established and unique sport that utilized a particular combination of skills not offered by other sports.

Further testimony by certain League and school officials traced the development of female athletics at Rogers High. Prior to 1971, girls had largely been relegated to cheerleader status. Since that year, however, Rogers High has fielded numerous all-female teams and has opened formerly all-male teams to open competition. Female interest in athletics has been impressive. Approximately forty-three percent of the positions on the various varsity teams are occupied by women.

Defendants argue that female high school athletics must be provided "separate but equal" teams if they are to have a meaningful opportunity for athletic competition and development. Without such special consideration, the strides made in female athletics would disappear.

In light of the evidence, these contentions are difficult to dispute. Rogers High has made a noble and noteworthy effort to provide athletic opportunities for females. At the high school level, the average male is objectively more physically capable than the average female. Open competition would, in all probability, relegate the majority of females to second class positions as benchwarmers or spectators. As the Sixth Circuit noted in the context of basketball,

[w]hen the classification, as here, relates to athletic activity, it must be apparent that its basis is the distinct differences in physical characteristics and capabilities between the sexes and that the differences are reflected in the sport of basketball by how the game itself is played. It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement. *Cape v.*

*Tennessee Secondary Sch. Athl. Ass'n.*, 563 F.2d 793, 795 (6th Cir. 1977).

Distinguishing between male and female athletics raises no constitutional problems. The school committee has acted upon a demonstrably benevolent purpose and on objective and accurate medical evidence. *See Califano v. Webster*, 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977). There is, however, no dispute on this aspect of Rogers High's athletic program. Plaintiff readily agrees that "separate but equal" teams are not only athletically beneficial, but also constitutionally permissible. *See Hoover v. Meiklejohn, supra; Ritacco v. Norwin Sch. Dist.*, 361 F.Supp. 930 (W.D.Pa.1973); *Bucha v. Illinois High Sch. Ass'n.*, 351 F.Supp. 69 (N.D.Ill.1972).

It is the second strand of defendants' argument that plaintiff heatedly contests. The defendants assert that they are not required by Title IX or the equal protection clause to provide males such as Donald an opportunity to compete either on the present team or on a separate all-male team. Defendants concede that this approach bestows a benefit upon females and penalizes males such as Donald. This disparate treatment, however, is allegedly justified because it is a purposeful method of overcoming past athletic discrimination against females. The defendants claim that this "affirmative action" of conferring special athletic opportunities upon women is both statutorily and constitutionally justified because it is a deliberate attempt to redress "our society's longstanding disparage treatment of women". *Califano v. Goldfarb*, 430 U.S. 199, 209 n. 8, 97 S.Ct. 1021, 1028 n. 8, 51 L.Ed.2d 270 (1977). *See Califano v. Webster*, 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977); *Schlesinger v. Ballard*, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975). They point out that Title IX reflects this affirmative approach and explicitly authorizes their present course of conduct.

Plaintiff counters by arguing that the constitution protects males as well as females against sex discrimination. *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Orr v. Orr*, —— U.S. ——, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979). He also relies upon Title IX and its regulations, arguing that the statute mandates sexual equality in athletics and prohibits the complete denial of an opportunity to play a sport such as volleyball.

The dispute is resolved by interpreting and applying the regulation promulgated under Title IX which explicitly deals with athletics and separate sex teams. The regulation, 45 C.F.R. § 86.41(a), assures that:

(a) *General.* No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

The second paragraph of the regulation specifically addresses the issue of separate teams and attempts to reconcile such teams with the broad promise of equal athletic treatment:

(b) *Separate Teams.* Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. *However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport.* For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose of major activity of which involves bodily contact. (Emphasis added).

Both sides agree that this regulation applies to this case but they dispute the interpretation of the phrase "and athletic oppor-

tunities for members of that [excluded] sex have previously been limited". Defendants argue that this phrase must be interpreted in a general sense and must refer to overall athletic opportunities for the sex. Thus, because only women have previously endured limited athletic opportunities, the phrase must only refer to the female sex. This interpretation would allow formation of separate female teams without male equivalents because overall athletic opportunities for males have never previously been limited; according to defendants' argument, male teams could not be established, except in contact sports, without female equivalents. Plaintiff takes a different approach and argues that the phrase must be interpreted in regard to the "particular sport" and team in question. Thus, because athletic opportunities have previously been limited for males in such sports as volleyball or field hockey, equivalent male teams must be established in these sports; such would not be the case in sports where males previously had equal or superior opportunities to participate.

This is a situation where both sides have offered equally intelligent, plausible and differing interpretations of an ambiguous phrase. This Court concedes that as a matter of linguistics both constructions are fully justified. If the Court accepts defendants' interpretation, however, serious questions arise concerning the constitutionality of the regulation. The defendants' approach would authorize schools to establish female teams in any sport without equivalent male teams because women have been generally deprived of athletic opportunities. Such a broadly focused remedial program may run afoul of the equal protection clause. The constitution does permit a legislature to bestow disproportionate benefits upon women if such legislative advantages are deliberately enacted to compensate for particular and provable economic and social disabilities suffered by women. *Califano v. Webster, supra.* Differences in treatment are not permissible if they are based on overbroad generalizations or are the "accidental byproduct of a traditional way of thinking about females". *Califano v. Gold-*

*farb,* 430 U.S. at 223, 97 S.Ct. at 1035 (Stevens, J., concurring in judgment).

Title IX and its regulations do evidence a deliberate intent to rid high school athletics of the sex discrimination that long plagued women athletes. Providing women with separate and exclusive teams in sports previously dominated by men appears a legitimate and narrowly drawn attempt to rectify past discrimination. Likewise, Rogers High School's decision to offer girls, but not boys, a choice between competing on an "open" team or on a single-sex team appears to be a legitimate attempt to encourage female athletics and rectify past discrimination. Both these alternatives provide women with some athletic advantages but assume that adequate opportunities will continue to exist in a particular sport for qualified males.

The practice challenged in this case is far different. Defendants would provide a single sex volleyball team for women while totally barring men from playing a sport in which males only have had limited opportunities to play. The athletic scheme is not directed toward the special disadvantages women have suffered in a particular sport and, thus, may be impermissibly overbroad. *See Weinberger v. Wiesenfeld,* 420 U.S. 636, 648, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975).

More troublesome is the drastic affirmative action remedy that defendants assert. To completely deny one sex any opportunity to participate in a federally funded activity from which either sex could benefit is an unprecedented doctrine. As previously stated, courts interpret the Constitution to permit "separate but equal" athletic teams; but, "separate but equal" necessarily envisions two equal systems, not an exclusive opportunity for only one sex to participate. *See, e. g., Vorchheimer v. School Dist. of Philadelphia,* 532 F.2d 880 (3d Cir. 1976) *aff'd without opinion* 430 U.S. 703, 97 S.Ct. 1671, 51 L.Ed.2d 758 (1977) (separate sex high schools). Further, the constitution permits a disadvantaged race or sex to receive some preferential treatment, but no affirmative action program has gone so far as to absolutely bar the other race or sex

from participation. *See, e. g., Regents of University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *Rhode Island Chapter, Assoc. of Gen. Contractors v. Kreps,* 450 F.Supp. 338 (D.R.I. 1978). *See also Schlesinger v. Ballard, supra* (women granted certain procedural advantages for promotion in Navy, yet men not barred from promotions).

Of course, Donald Gomes is not barred from all athletic opportunities because Rogers High continues to provide various athletic teams for both males and females; yet, this is small consolation for an individual whose skills and desires are particularly suited for the unique game of volleyball. The theoretical opportunity to play other sports has never been a justification for sexual discrimination which bars the door to a particular sport.[2] *See Brenden v. Independent Sch. Dist. 742, supra; Petterson v. Rhode Island Interscholastic League,* C.A. # 78–573 (D.R.I.1978). Any interpretation of 45 C.F.R. § 86.41 that permits such a sexually exclusionary athletic program, raises serious question concerning the constitutional validity of that regulation.

■■■ A much wiser course, as Chief Justice Marshall observed, is to interpret legislation so as to avoid questions of its constitutional validity. *Murray v. Schooner Charming Betsy,* 6 U.S. 64,118 (2 Cranch 1804) 2 L.Ed. 208. *See also National Labor Relations Board v. Catholic Bishop of Chicago,* —— U.S. ——, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). Plaintiff's narrower interpretation of the regulation avoids the serious constitutional problems raised by defendants' construction. A separate and exclusive female team may be established only when males previously had, and presumably continue to have, adequate athletic opportunities to participate in that sport.[3] At least in terms of volleyball at Rogers High, athletic opportunities for males have been severely limited. Therefore, 45 C.F.R. § 86.41 is best read as requiring Rogers High School to provide Donald Gomes with the opportunity to play interscholastic volleyball either by establishing a separate volleyball team for boys or by allowing Donald to compete on the present girls' team, or by some other practical means.

This interpretation of the federal regulation convinces this Court that a preliminary injunction must issue. Donald has successfully argued the merits of his case. The irreparable harm he would suffer by missing the volleyball season is unquestioned. *See Petterson v. Rhode Island Interscholastic League, supra.* In light of his relatively limited ability, there is little possibility that

2. This does not mean that the sports offered males and females must be identical in every respect. Rule differences between boys and girls sports are certainly legitimate, even if they change the nature of the game significantly. *Cape v. Tennessee Secondary Sch. Athl. Ass'n,* 563 F.2d 793 (6th Cir. 1977). This is true even if the rules change the name of the game; thus, school administrators could legitimately decide to offer baseball for boys and softball for girls. A federal court is no place to decide whether a particular sex should be allowed to dribble the full length of a basketball court or pitch underhand. *See Hoover v. Meiklejohn,* 430 F.Supp. 164, 171 (D.Colo.1977).

This case, however, presents a different issue. The plaintiff here is totally denied the opportunity to play a recognized sport on the interscholastic level. No other sport combines the same combination of athletic skills as volleyball. Different rules may change the pace, character and nature of the sport, but they still permit both sexes to utilize the unique combination of athletic skills characteristic of the sport.

3. For example, the regulation would permit the establishment of an all-girls team without an equivalent all-male team in a sport where women have had limited athletic opportunities (baseball, for example). In such a situation, an all-male equivalent would be unnecessary. Males could (as they do at Rogers High School) compete on a "co-ed" or "open" team. In the alternative, a school might arrange for their male students to participate on another school's male or co-ed baseball team. Perhaps, in a sport long dominated by males, a school could even create only a female team without making any provisions for male participation; such a hypothetical situation might be constitutionally permissible because Congress could find that sufficient athletic opportunities existed in the private sector for males to play the particular sport. In all these scenarios, women are given the advantage of nurturing their talents within the context of single-sex competition while male students are not completely denied the opportunity to compete in a particular sport.

his participation will substantially disrupt League play or provide one team with a disproportionate advantage. There is no evidence that this limited preliminary injunctive relief will lead to a sudden male influx or domination of Rhode Island interscholastic volleyball. Defendants admit that, at this time, there is little interest in volleyball among the general male population at Rogers High. Nor is there any evidence that any other male at any League affiliated school qualified for a position on a volleyball team during the time limits designated by the League rules. Therefore, a preliminary injunction can prevent plaintiff's irreparable harm without disrupting other students' rights to play in a competitive athletic league.

This conclusion in no way minimizes the expert athletic and medical evidence offered at the hearing. Separate but equal volleyball teams do appear the most advantageous athletic approach. But whether such teams are created at Rogers High School can only be decided by the school administrators, the coaches, and, ultimately, the political process. A court can only approach the problem in a more generalized fashion and interpret statutes in light of broad constitutional requirements. Within the broad commands of the constitution, there is certainly leeway to create fair and equal athletic opportunities for both sexes; the details of such plans are best formulated by the political process, not a federal court.

An order will be prepared accordingly.