<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 99-1385

             STACEY PERKINS, p.p.a. TERRI PERKINS,

                     Plaintiff, Appellant,

                               v.

                  LONDONDERRY BASKETBALL CLUB,

                      Defendant, Appellee.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF NEW HAMPSHIRE

         [Hon. Paul J. Barbadoro, U.S. District Judge]

                             Before

                     Selya, Circuit Judge,
                                
               Campbell, Senior Circuit Judge,
                                
                  and Boudin, Circuit Judge.
                                
                                
                                
    Linda S. Johnson, with whom Rachel A. Hampe, Ann Marie Dirsa,
and McLane, Graf, Raulerson & Middleton, P.A. were on brief, for
appellant.
    Joseph L. Hamilton, with whom Hamilton Law Offices was on
brief, for appellee.

November 8, 1999

                                
                                

 SELYA, Circuit Judge.  Plaintiff-appellant Stacey
Perkins, suing by and through her mother and next friend, Terri
Perkins, alleges that defendant-appellee Londonderry Basketball
Club (LBC) violated the Fourteenth Amendment when it refused to
allow her to play in a youth basketball tournament because of her
gender.  The United States District Court for the District of New
Hampshire, discerning no state action, resolved the constitutional
claim adversely to the appellant (albeit without reaching the
merits) and declined to exercise supplemental jurisdiction over the
appellant's pendent state-law claims.  We affirm.
I.  BACKGROUND
 We marshal the facts in the light most hospitable to the
appellant's theory of the case, drawing all reasonable inferences
in her favor.  See Coyne v. Taber Partners I, 53 F.3d 454, 456 (1st
Cir. 1996).
 Stacey Perkins is a ten-year-old female with an affinity
for the sport of basketball.  She resides in Seabrook, New
Hampshire, a community which has no competitive "all-girls"
basketball league for Stacey's age group.  At the start of the
1997-1998 season, Stacey seized the only realistic opportunity for
a girl of her age to compete and joined the "Red Devils," a mixed-
gender team that plays in the Seabrook Recreational League (SRL).  
In March 1998, Stacey was one of two girls selected to play on the
SRL's twelve-member All-Star team.
 The scene now shifts from Seabrook to Londonderry, New
Hampshire (the Town), where basketball has proven to be a popular
pastime.  In the 1980s, Arthur Psaledas, the Town's Recreation
Director, ran a youth basketball program on his own time.  As
demand increased, however, Psaledas could not keep pace, and
several community groups banded together in 1990 to form LBC (a
voluntary, nonprofit organization that enjoys tax-exempt status
under 26 U.S.C.  501(c)(3)).  In furtherance of its mission to
provide basketball opportunities for the Town's young people, LBC
manages single-sex boys' and girls' teams for third- through
eighth-graders.  To cap the season, it sponsors a one-week annual
tournament (really two tournaments, because LBC splits it into
separate brackets for boys and girls).
 LBC solicits donations to support its activities.  The
annual tournament constitutes its most substantial fundraising
event:  registration fees, ticket sales, and souvenir sales (e.g.,
T-shirts) all generate revenues.  LBC and the Town's Recreation
Commission have a modest interlock   two members of LBC's five-
member board of directors happen to serve as members of the
Recreation Commission   and Commission members often assist as
volunteers at the tournament by keeping score, running the clock,
and the like.
 LBC uses the Town's public school gymnasia for league and
tournament play.  Gym time is allocated by Psaledas, who holds a
yearly meeting for that purpose with user representatives and Town
officials.  Like other groups that use the Town's facilities, LBC
pays a mandatory security fee to a private service but pays no
rent.
 Beginning in 1996, the Town adopted sanctioning
requirements in an effort to prioritize requests for extra-
curricular use of school gyms.  We reprint the sanctioning
requirements in an appendix.  Uncontroverted evidence makes clear
that the Town's goal in adopting these requirements was to bring
competing groups together and thus lessen the burden on municipal
facilities.  LBC sought and gained the Town's imprimatur under the
sanctioning requirements.
 As part of an allocation process, each group that aspires
to gym use is required to submit a request for dates to the Town's
School District.  Because Psaledas has been handling these
submissions for many years, he knows the needs of the basketball,
soccer, volleyball, and other leagues and automatically furnishes
information to the School District on behalf of LBC and other
similarly situated private groups.  Although non-sanctioned groups
may use the gyms, sanctioned groups receive priority.  Moreover,
Psaledas occasionally has moved adult groups to different time
slots to accommodate LBC's tournament-related needs.
 There are other points of contact between LBC and the
Town:  LBC holds meetings in school buildings, distributes flyers
regarding tryout schedules through the schools, and relies on
Psaledas to inform it when the School District cancels its
programs.  The most salient contact point is financial:  LBC from
time to time contributes money to the Town's schools for
scholarships, travel, uniforms, basketball equipment, court
maintenance, and the like.  Between 1991 and 1998, these donations
amounted to $22,000.  In the event LBC were to dissolve, its
charter provides that all its assets would be distributed to the
Town.
II.  THE DENOUEMENT
 The SRL arranged for its All-Star team to play in LBC's
tenth annual "boys'" tournament.  The schedule called for the team
to play its first game on March 24, 1998.  But LBC opted to apply
its policy of "separate and equal" brackets, which contained no
provision for mixed-gender play, even where, as in this case, a
child's community offered no single-sex team on which she could
compete.  In accordance with the policy (which LBC defends as an
attempt to maximize the participation of both sexes), LBC informed
Stacey's coach that girls would not be allowed to participate in
its boys' tournament.
 Three days later, Stacey sued LBC.  She alleged equal
protection violations under the Fourteenth Amendment and 42 U.S.C.
1983 as well as a number of claims under state law.  Her
complaint sought variegated relief, including an order enjoining
LBC from denying her the opportunity to play in the tournament and
an award of money damages.  Any prospect of a temporary restraining
order evaporated when the SRL All-Star team withdrew from the
tournament.  Stacey's suit nevertheless proceeded, principally on
her claim for damages.
 Following a plenitude of pretrial discovery, LBC moved
for summary judgment.  In a meticulously reasoned unpublished
opinion, the district court granted the motion as to the Fourteenth
Amendment and section 1983 claims, holding that LBC's conduct did
not constitute state action.  The court simultaneously dismissed
the supplemental state-law claims without prejudice.  See 28 U.S.C.
1367(c).  This appeal, in which we review the lower court's grant
of summary judgment de novo, see Coyne, 53 F.3d at 457, followed.
III.  ANALYSIS
 Despite criticism from the academy, the public/private
dichotomy remains embedded in our constitutional jurisprudence.  
See National Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179,
191 (1988).  This dichotomy distinguishes between state action,
which must conform to the prescriptions of the Fourteenth
Amendment, and private conduct, which generally enjoys immunity
from Fourteenth Amendment strictures.  See id.; Jackson v.
Metropolitan Edison Co., 419 U.S. 345, 349 (1974).  The line of
demarcation between public and private action, though easily
proclaimed, has proven elusive in application.  And the Justices,
mindful of the fact-sensitive nature of the inquiry, have staunchly
eschewed any attempt to construct a universally applicable litmus
test to distinguish state action from private conduct.  Instead,
they have directed lower courts to take a case-by-case approach,
"sifting facts and weighing circumstances [so that] the nonobvious
involvement of the State in private conduct [can] be attributed its
true significance."  Burton v. Wilmington Parking Auth., 365 U.S.
715, 722 (1961).
 There is no direct "state action" here:  the parties, who
agree on little else, concur that LBC is not structurally an arm of
municipal government.  In cases that involve indirect state action,
courts conventionally have traveled a trio of analytic avenues,
deeming a private entity to have become a state actor if (1) it
assumes a traditional public function when it undertakes to perform
the challenged conduct, or (2) an elaborate financial or regulatory
nexus ties the challenged conduct to the State, or (3) a symbiotic
relationship exists between the private entity and the State.  See
Barrios-Velzquez v. Asociacin de Empleados, 84 F.3d 487, 493 (1st
Cir. 1996); Rodrguez-Garca v. Davila, 904 F.2d 90, 96 (1st Cir.
1990).  A common thread binds these pathways.  Each of them, from
a slightly different coign of vantage, aims at the same
destination:  whether "private actors [have] aligned themselves so
closely with either state action or state actors that the undertow
pulls them inexorably into the grasp" of the Fourteenth Amendment.  
Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 253-54 (1st
Cir. 1996).  The appellant hypothesizes that each and all of these
avenues lead to the conclusion that LBC's conduct meets the
requirements of the state action doctrine.  We explore the validity
of that hypothesis.
                A.  Traditional Public Function.
 Pointing out that LBC took over the task of operating the
youth basketball program from the Town's Recreation Director, the
appellant contends that LBC assumed a traditional public function.  
On the facts, this contention lacks force.  The record establishes
beyond peradventure that Psaledas never ran a youth basketball
program in his capacity as Recreation Director. Indeed, private
sponsorship of youth basketball existed in Londonderry well before
LBC's formation.
 More importantly, however, the appellant's construct
misconstrues the law.  The public function analysis is designed to
flush out a State's attempt to evade its responsibilities by
delegating them to private entities.  See Barrios-Velzquez, 84
F.3d at 494.  In order to prevail on such a theory, a plaintiff
must show more than the mere performance of a public function by a
private entity; she must show that the function is one exclusively
reserved to the State.  See id. at 493-94.  Government customarily
involves itself in many types of activities, but few of those
activities come within the State's exclusive preserve.  To date,
the short list of activities that have been held to satisfy this
demanding criterion includes "the administration of elections, the
operation of a company town, eminent domain, peremptory challenges
in jury selection, and, in at least limited circumstances, the
operation of a municipal park."  United Auto Workers v. Gaston
Festivals, Inc., 43 F.3d 902, 907 (4th Cir. 1995) (citations
omitted).  When a plaintiff ventures outside such narrow confines,
she has an uphill climb.
 The appellant cannot scale these heights.  The case law
makes pellucid that the administration of an amateur sports program
lacks the element of exclusivity and therefore is not a traditional
public function.  See Tarkanian, 488 U.S. at 197 n.18 (discussing
the NCAA's overriding function of fostering amateur athletics at
the college level, and noting that "while we have described that
function as 'critical,' by no means is it a traditional, let alone
an exclusive state function" (citation omitted)); San Francisco
Arts & Athletics, Inc. v. United States Olympic Comm., 483 U.S.
522, 545 (1987) ("Neither the conduct nor the coordination of
amateur sports has been a traditional governmental function.");
Behagen v. Amateur Basketball Ass'n, 884 F.2d 524, 531 (10th Cir.
1989); McCormack v. National Collegiate Athletic Ass'n, 845 F.2d
1338, 1346 (5th Cir. 1988); Ponce v. Basketball Fed'n, 760 F.2d
375, 381 (1st Cir. 1985).
 The fact that LBC's basketball program targets children
rather than adults provides no succor to the appellant.  In
Rendell-Baker v. Kohn, 457 U.S. 830, 842 (1982), the Court held
that the education of maladjusted high-school students was not an
exclusive function of the State and therefore was not an inherently
governmental function.  If youngsters' education does not qualify
under the Court's test, the coordination of a youth basketball
league a fortiori falls outside the range of such functions.  
Accord Magill v. Avonworth Baseball Conf., 516 F.2d 1328, 1332 (3d
Cir. 1975) (holding that the operation of a youth baseball league
did not constitute private performance of a governmental function);
cf. Fortin v. Darlington Little League, Inc., 514 F.2d 344, 347
(1st Cir. 1975) (finding state action but declining to hold that
the Little League had assumed a governmental function).  We
therefore reject the appellant's attempt to ground state action in
LBC's performance of a function that we conclude is not exclusively
governmental.

                           B.  Nexus.
 In order to prevail under the second test for state
action, a plaintiff must show a "close nexus between the State and
the challenged action of the [private] entity so that the action of
the latter may be fairly treated as that of the State itself."  
Jackson, 419 U.S. at 351.  Such a nexus requires more than the
State's passive acquiescence in, or mere approval of, the
challenged conduct.  See American Mfrs. Mut. Ins. Co. v. Sullivan,
119 S. Ct. 977, 986 (1999).  Rather, the plaintiff must show that
the State "has exercised coercive power or has provided such
significant encouragement, either overt or covert," that the
challenged conduct fairly can be attributed to the State.  Blum v.
Yaretsky, 457 U.S. 991, 1004 (1982).
 This inquiry is a targeted one, with the challenged
conduct at the hub of the analytical wheel.  Thus, the focal point
is the connection between the State and the challenged conduct, not
the broader relationship between the State and the private entity.  
See id.  Extensive regulation, without more, cannot establish the
necessary nexus.  See United States Olympic Comm., 483 U.S. at 544;
Blum, 457 U.S. at 1004.  Indeed, even when the State has conferred
monopoly status on a private entity, courts will not find state
action on a nexus theory absent a snug relationship between the
grant of monopoly power and the challenged conduct itself.  See
Jackson, 419 U.S. at 351-52.
 We need not tarry.  For the purpose of nexus analysis,
the appellant's claim that the Town, as a general matter, exercises
a modicum of control over LBC by reason of the sanctioning
requirements and the reserved power to regulate the use of school
gymnasia misses the mark.  So, too, her related claim that the
Town's provision of generic benefits (such as the rent-free use of
facilities) constitutes significant encouragement.  Both claims
overlook the hub   the centrality of the challenged conduct to a
properly performed nexus analysis   for the spokes.
 In point of fact, the appellant can prevail in this
instance only by demonstrating that the Town exercised coercive
power over, or significantly encouraged, LBC's promulgation of the
same-sex tournament rule or its decision to ban the appellant from
tourney participation.  We have combed the record and have found
absolutely no evidence that the Town acted in such a fashion.  
Hence, the nexus claim fails.
                         C.  Symbiosis.
 The appellant masses her heaviest artillery behind the
claim that LBC and the Town enjoyed a symbiotic relationship,
sufficient to establish state action.  In an evolving area of the
law, this claim's provenance is open to question.
                               1.
 Almost four decades ago, the Supreme Court held that a
symbiotic relationship between a State and a private entity
justified a finding of state action.  See Burton, 365 U.S. at 725.  
In several later cases, however, the Court has either distinguished
or ignored Burton's broadest language.  See, e.g., Sullivan, 119 S.
Ct. at 988-89; United States Olympic Comm., 483 U.S. at 547; Blum,
457 U.S. at 1011.  Still, the Court has never expressly overruled
Burton, and none of the later cases have involved equal protection
claims based on race or gender discrimination.  Cf. Girard v. 94th
St. & Fifth Ave. Corp., 530 F.2d 66, 69 (2d Cir. 1976) (suggesting
that state action requirements may be less demanding for such
claims); Weise v. Syracuse Univ., 522 F.2d 397, 405-07 (2d Cir.
1975) (similar).
 In all events, we need not determine today either the
extent to which Burton remains good law or whether the parameters
of what constitutes state action may change depending on the nature
of the right at issue.  Even if we treat Burton's classic
symbiotic relationship test as fully intact, the appellant cannot
prevail.
 In terms, this test requires an evaluation of whether the
government "has so far insinuated itself into a position of
interdependence with [the private entity] that it must be
recognized as a joint participant in the challenged activity."  
Burton, 365 U.S. at 725.  A true symbiosis is predicated on
interdependence and joint participation.  Thus, in contrast to the
nexus inquiry, this avenue of approach ousts the challenged conduct
from center stage and concentrates instead on the nature of the
overall relationship between the State and the private entity.  See
id.; Rodrguez-Garca, 904 F.2d at 96-97.
 Despite this focus on the totality of the circumstances,
the case law suggests some factors to which courts typically attach
special weight.  The most salient of these is the extent to which
the private entity is (or is not) independent in the conduct of its
day-to-day affairs.  See Evans v. Newton, 382 U.S. 296, 301 (1966);
Barrios-Velzquez, 84 F.3d at 494-95; United Auto Workers, 43 F.3d
at 908.  Relatedly, the circumstances surrounding a private
entity's use of public facilities warrant careful attention.  In
this regard, courts long have recognized that a municipality's mere
provision of recreational fora (such as athletic facilities) does
not give rise to state action.  See Gilmore v. City of Montgomery,
417 U.S. 556, 574 (1974); Sherman v. Community Consol. Sch. Dist.
21, 8 F.3d 1160, 1167-68 (7th Cir. 1993); Magill, 516 F.2d at 1333,
1335; Fortin, 514 F.2d at 347.  If, however, a municipality
"rations otherwise freely accessible recreational facilities, the
case for state action will naturally be stronger than if the
facilities are simply available to all comers without condition or
reservation."  Gilmore, 417 U.S. at 574.
 Subject to certain caveats, another factor that courts
take into account in evaluating the nature of the relationship
between the State and a private entity is whether (and if so, to
what extent) the former knowingly shared in the profits spawned by
the latter's discriminatory conduct.  See Barrios-Velzquez, 84
F.3d at 494.  The caveats are these.  First, this factor implicates
only profits arising from the challenged conduct, rather than from
the relationship as a whole.  See id.; Ponce, 760 F.2d at 382.  
Second, for profit-sharing to be relevant, the challenged conduct
must be indispensable to the financial success of the joint
project.  See Burton, 365 U.S. at 723-24; Ponce, 760 F.2d at 381-
82.  This tracks nicely with the use/rationing distinction, because
government is more likely to ration its facilities to favor a
private entity when the private entity's profits are indispensable
to the government's anticipated return from the project.

                               2.
 Here, the appellant posits that the Town's sanctioning
requirements and control over scheduling constitute impermissible
rationing and, thus, joint participation.  The district court
disagreed, and so do we.
 As the appellant constructs it, this argument emphasizes
Sanctioning Requirement No. 3 (which stipulates that, as a
condition to sanctioned status, an organization must represent that
there is "no other sanctioned program in existence that offers the
same or similar program").  In her view, this requirement ensures
monopoly status and excludes competing groups from the use of Town
facilities.  The record, however, belies this conclusion.
 In the first place, the nisi prius roll is bereft of any
evidence that other youth basketball programs have been deterred
from attempting to secure sanctioning or to obtain gym time.  
Absent such a showing, the most that can be said is that LBC took
advantage of an opportunity that the Town made available to all
organizations of its type.  Conduct that involves no more than
seizing a widely available opportunity offered by the State will
not justify a finding of impermissible rationing.  See Sherman, 8
F.3d at 1167; Magill, 516 F.2d at 1335.
 In the second place, the record reflects that both
sanctioned and non-sanctioned groups actually use the gyms.  
Although sanctioned groups theoretically receive priority in
scheduling, this fact alone, without proof of adverse effects, does
not amount to the type of rationing that constitutes state action.  
See Magill, 516 F.2d at 1335 (explaining that facility-use
decisions, in and of themselves, did not "significantly involve[]
the state in [the athletic conference's] gender policy").
 Going beyond the sanctioning requirements, the appellant
maintains that Fortin controls our resolution of her claim.  In
that case, we held that a Little League's "heavy and preferred
dependency upon city facilities" justified a finding of joint
participation.  514 F.2d at 347.  But Fortin involved a much
different scenario.  There, the city laid out and maintained
recreational facilities (baseball diamonds and their accouterments)
primarily for the benefit of the Little League.  See id.  During
the baseball season, the Little League preempted the facilities
five nights per week and on Saturdays, vastly restricting other
groups' access to them, to the point that other users often were
precluded from all practical access.  See id.  In contrast, the
Town's gyms are used primarily for school purposes and, after
hours, are frequented by an array of other groups (e.g., volleyball
teams, men's basketball teams), including but not limited to LBC.  
Thus, Fortin does not advance the appellant's cause.  Her rationing
argument therefore fails.
 The appellant next proposes that a symbiotic relationship
exists because the Town knowingly shares in profits generated by
the challenged conduct (i.e., the same-sex tournament rule).  In
advancing this proposal, the appellant seizes upon testimony that
links LBC's same-sex rule to its desire to maximize participation
in its tournament.  Building on this foundation, the appellant
asserts that, by maximizing participation, the rule simultaneously
maximizes LBC's profits and therefore maximizes the Town's profits.  
Passing the fact that the appellant unveils this assertion for the
first time on appeal (and it is, therefore, procedurally defaulted,
see Campos-Orrego v. Rivera, 175 F.3d 89, 95 (1st Cir. 1999)), the
piling of inference upon inference does not prove the appellant's
point.  We explain briefly.
 Even if maximization of participation can by some alchemy
be converted, without proof, into maximization of LBC's profits,
the record contains nothing which indicates that the Town knowingly
shared in any incremental revenues that were so generated.  The
mere fact that, over the years, LBC donated some $22,000 to the
Town   a relatively small percentage of the total funds that it
raised   does not suffice to bind the Town's gain to the same-sex
tournament rule.  See Barrios-Velzquez, 84 F.3d at 494.  Nor does
the record permit a finding that the rule was indispensable to the
Town's success vis--vis the venture.  Assuming, arguendo, that
repealing the rule would shrink LBC's revenues, there is no basis
for a finding that LBC's donations to the Town also would shrink,
let alone that they would diminish so drastically as to undermine
the Town's approval of LBC's use of public school gymnasia.  From
aught that appears, LBC's largesse has not been based on a
percentage of funds raised at the tournament or on any other
formula pegged to tournament revenues.  And without factual support
for the conclusory claim that the same-sex tournament rule (which
the Town had no hand in propounding) is indispensable to the Town's
success anent the venture, the profit-sharing rationale will not
wash.  See Burton, 365 U.S. at 723-24.
 Finally, the appellant labors to demonstrate that LBC is
not independent in the conduct of its everyday affairs.  She does
not succeed.  Sanctioning by the Town does not evince an
insinuation of the Town into LBC's ordinary course of day-to-day
business; instead, sanctioning represents the Town's attempt to
administer its own resources for the benefit of its residents.  In
all events, LBC's purview is not confined to the one-week life span
of tournament play.  Rather, it administers and coordinates teams
of youngsters throughout a lengthy season and performs all the pre-
season preparation that such an undertaking invariably entails.  
The Town simply is not involved to any meaningful degree in those
myriad activities.  Moreover, what the appellant perceives as an
interlock between LBC and the Recreation Commission does not alter
this decisional calculus.  While two LBC directors serve as members
of the Recreation Commission, and Commission members assist at the
annual one-week tournament by performing menial tasks, such
discrete incidents of assistance do not constitute municipal
involvement in the daily management of LBC's affairs.  See Evans,
382 U.S. at 301; United Auto Workers, 43 F.3d at 908.
 The short of it is that we find in this case the
coordination of efforts that often characterizes the operation of
private youth groups at public schools, but no "significantly
probative" evidence, Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
249-50 (1986), that the Town and the private entity have become so
joined at the hip that a symbiotic relationship persists.  To the
precise contrary, the facts, though we have viewed them in the
light most congenial to the appellant, do not warrant a finding of
joint participation to the degree needed to sustain a claim of
state action.
IV.  CONCLUSION
 As we have considered all of the appellant's remaining
arguments and found them unconvincing, we need go no further.  In
closing, however, let us be perfectly clear.  We regard what has
occurred as extremely lamentable   after all, we have not been
provided with any cogent justification for LBC's same-sex
tournament rule, which effectively deprived Stacey Perkins of an
opportunity to play in the youth basketball tournament.  But the
regulation of private entities like LBC normally is accomplished
through statutes, not through the Constitution.  And although
Stacey's constitutional claim fails for want of state action, she
has asserted state-law claims which may be litigated anew in the
New Hampshire courts.  See 28 U.S.C.  1367(c).

Affirmed.

                            APPENDIX
The Town's sanctioning requirements for use of the school gyms,
quoted verbatim and in full, provide that:
          1.     60% of the participants are residents of
        Londonderry

          2.     The coaches/supervisors are residents of
        Londonderry

          3.     There be no other sanctioned program in existence
        that offers the same or similar program

          4.     That the program be a permanent one, and not
        simply a one season or one year program

          5.     That there be a demonstration that the program
        has been well planned and will be properly
        supervised

          6.     That the group requesting sanctioning demonstrate
        that they have the proper frame work [sic] for
        leadership, and the people who will provide this
        leadership

          7.     That the group has no outstanding financial
        obligations that would hinder the group's
        progress

          8.     All sanctioned groups must comply will [sic] all
        the rules set forth by the School District and
        Recreation Commission regarding usage of
        facilities.  Failure to comply with the rules can
        result in the withdrawal of the Commission's
        sanction of the group.

</body>

</html>