Attorney General & others[1] vs. Massachusetts Interscholastic Athletic Association, Inc. & others.[2]

Suffolk. March 8, 1979. — July 2, 1979.

Present: Hennessey, C.J., Quirico, Kaplan, Wilkins, & Abrams, JJ.

*School and School Committee*, Sex discrimination. *Constitutional Law*, Equal Rights Amendment, Equal protection of laws, Sex discrimination, Sports.

A rule of the Massachusetts Interscholastic Athletic Association, Inc., barring all males from participating on girls' sports teams was prima facie invalid under the Massachusetts Equal Rights Amendment and G. L. c. 76, § 5. [349-353]

Under the Massachusetts Equal Rights Amendment it is required that any purported justification for a classification based on sex, including one claimed to involve "affirmative action," should be weighed with great care. [354-357]

A rule of the Massachusetts Interscholastic Athletic Association, Inc., which contained a blanket prohibition of male participation on girls' sports teams could not be justified under the Massachusetts Equal Rights Amendment on the ground that the classification was based not on sex but on functional differences deriving from biology. [357-359]

A rule of the Massachusetts Interscholastic Athletic Association, Inc., which contained a blanket prohibition of male participation on girls' sports teams could not be justified under the Massachusetts Equal Rights Amendment on the ground that it was necessary to protect players' safety. [359-360]

A rule of the Massachusetts Interscholastic Athletic Association, Inc., which contained a blanket prohibition of male participation on girls' sports teams could not be justified under the Massachusetts

---

[1] Gregory R. Anrig, Commissioner of Education, and the members of the Board of Education.

[2] The members of the Massachusetts Interscholastic Athletic Council and Bertram H. Holland, executive director of the Association and secretary of the Council.

Equal Rights Amendment on the ground that it was an "affirmative action" measure necessary to prevent the swamping of girls' teams by boys of skill and prowess superior to those of girls. [360-363]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on October 11, 1978.

The case was reported by *Liacos*, J.

*Robert H. Bohn, Jr.*, Assistant Attorney General (*Joan Entmacher*, Assistant Attorney General, with him) for the plaintiffs.

*Roger Dowd* (*Ben D. Cooper* with him) for the defendants.

KAPLAN, J. Believing that a rule of the defendant Massachusetts Interscholastic Athletic Association, Inc., (MIAA) that "No boy may play on a girls' team," as impressed upon and carried out by public schools under school committee jurisdiction, was unlawful, the State Board of Education referred the matter to the Attorney General for appropriate action under G. L. c. 15, § 1G.[3] The Attorney General decided to resort to litigation and, joining with him the Board of Education and the Commissioner of Education, he commenced the present action in October, 1978, in the Supreme Judicial Court for Suffolk County against MIAA, the interrelated Massachusetts Interscholastic Athletic Council (Council), and an in-

---

[3] Section 1G, inserted by St. 1965, c. 572, § 2, provides in pertinent part that the Board of Education "shall see to it that all school committees comply with all laws relating to the operation of the public schools and in the event of noncompliance the commissioner of education shall refer all such cases to the attorney general of the Commonwealth for appropriate action to obtain compliance." See *Board of Educ.* v. *School Comm. of Springfield*, 370 Mass. 37, 60 n.27, 62 (1976). Cf. *Attorney Gen.* v. *Dover*, 327 Mass. 601 (1951).

The Attorney General in argument also mentioned as authority for bringing the action G. L. c. 12, § 10, as appearing in St. 1960, c. 788, which requires him to "take cognizance of all violations of law or of orders of courts, tribunals or commissions affecting the general welfare of the people . . . and . . . institute or cause to be instituted such criminal or civil proceedings before the appropriate state and federal courts, tribunals and commissions as he may deem to be for the public interest."

dividual occupying important positions in both organiza-
tions. The plaintiffs prayed a declaration that the quoted
rule violates the Massachusetts Equal Rights Amend-
ment (ERA)[4] as well as G. L. c. 76, § 5,[5] and regulations
promulgated under that statute,[6] and requested corre-

[4] Article 1 of the Declaration of Rights of the Massachusetts Consti-
tution, as amended by art. 106 of the Amendments to the Constitution,
ratified by the people on November 2, 1976, provides in part: "Equality
under the law shall not be denied or abridged because of sex, race,
color, creed or national origin."

[5] General Laws c. 76, § 5, as amended through St. 1973, c. 925, § 9A,
provides in part: "No person shall be excluded from or discriminated
against in admission to a public school of any town, or in obtaining the
advantages, privileges and courses of study of such public school on
account of race, color, sex, religion or national origin." (The parties
have stipulated that "[i]nterscholastic athletic programs are consid-
ered among the advantages and privileges of public schools.")
    Section 5 was amended in 1971 (St. 1971, c. 662, § 1) to include sex
(and national origin) among the forbidden classifications and to add
the "advantages, privileges and courses of study" language. See Lund
& Healy, Sex Discrimination, 1971 Ann. Survey Mass. Law 562, 574.
Section 5 establishes a level of protection against sex discrimination
higher than that thought to be provided at the time by the State or
Federal Constitution. With the passage of ERA, our constitutional law
has caught up to § 5. The parties assume that on this subject the
statute equates with ERA, and we do the same.

[6] Sections 6.01, 6.02, 6.07, and 6.08 (8 Code Mass. Regs. 466, 467, as
amended, 132 Mass. Reg. 82 [1978]) are mentioned. At present they
provide:
    "6.01 Advantages and privileges of public schools include all extra-
curricular activities made available, sponsored or supervised by any
public school. No school shall sponsor or participate in the organiza-
tion of outside extra-curricular activities conducted at such school
which restrict student participation on the basis of race, color, sex,
religion or national origin. This regulation does not prohibit school
committees from allowing use of school premises by independent
groups with restrictive membership.
    "6.02 No student shall be denied the opportunity in any implied or
explicit manner to participate in an extra-curricular activity because
of the race, color, sex, religion or national origin of the student except
as provided in section 6.07.
    "6.07 A school may establish separate teams for males and females
for interscholastic and intramural competition in a particular sport,
provided that the requirements of section 6.08 are satisfied.
    "6.08 Teams comprised primarily or solely of persons of one sex

sponding injunctive relief. After answer, the parties joined in a stipulation of facts, and a single justice reserved and reported the case upon the pleadings and stipulation. We outline the facts as they appear without significant dispute.

Virtually all public secondary schools in the Commonwealth are members of MIAA and, by virtue of what is in effect a delegation of authority by local school committees under G. L. c. 71, § 47,[7] MIAA governs and regulates competitive sports among these schools. Some private secondary schools are likewise members and enter into the same competition. All member schools undertake to submit to the rules promulgated by MIAA; they pay dues to MIAA in proportion to their student populations. (MIAA also shares in the receipts from Statewide tournaments, many of which are held on State-owned property.)

Framing of the rules which cover all aspects of interscholastic sports, including practice time, recruitment, and age, academic, and residence requirements for player eligibility, is in the hands of the Council, whose members, parties defendants here, are drawn from a Statewide association of school committees, and from associations of school superintendents, administrators, and principals.

---

shall be granted equal instruction, training, coaching, access to available facilities, equipment and opportunities to practice and compete as teams engaged in a similar activity comprised primarily or solely of persons of the opposite sex."

The regulatibns do not appear to add to the prohibitions of the statute as to gender-based exclusion from an activity (see note 5, *supra*), but they do purport to legitimate "separate but equal" teams. In a situation where no separate team is provided for boys, rule 6.02 seems to prohibit the kind of exclusion worked by the MIAA rule in question here.

[7] Section 47, as amended through St. 1970, c. 721, provides in pertinent part that local school committees "may supervise and control all athletic and other organizations composed of public school pupils and bearing the school name or organized in connection therewith," and "may directly or through an authorized representative determine under what conditions the same may compete with similar organizations in other schools."

MIAA may recommend rule changes to the Council, and it is the MIAA's executive body, called the Board of Control, that is responsible for enforcement (including interpretation) of the rules, with power to impose a variety of sanctions upon offending member schools, ranging from warning or censure to a year's suspension from interscholastic play. Because the rules are comprehensive in scope, it is evident that their policies reach beyond the interscholastic sphere and to some considerable extent also influence the intramural athletic activities of the member schools.

The rules "recognize" for interscholastic play sixteen boys', and thirteen girls' sports: the names coincide except that baseball, football, hockey, riflery, and wrestling are listed only for boys, and field hockey and softball only for girls.[8] Originally part II, § 1, rule 17, entitled "Boys and Girls on the Same Team," provided for strict sex segregation. By 1976, evidently reflecting regulations promulgated by the State Board of Education, and, more generally, the adoption of ERA in that year, rule 17 had been amended so that a student could not be barred from competing for a place on a team because of sex unless the school provided a "separate but equal" team.[9]

---

[8] Part II, § 1, rule 1, states: "1. The following sports are recognized by the MIAA as interscholastic sports for the purpose of eligibility rulings:

"A. Boys Baseball *Basketball Cross Country *Football Golf Gymnastics *Hockey *Lacrosse Riflery Skiing *Soccer Swimming Tennis Track (Winter and Spring) Volleyball *Wrestling

"B. Girls *Basketball Cross Country *Field Hockey Golf Gymnastics *Lacrosse *Soccer Softball Skiing Swimming Tennis Track (Winter and Spring) Volleyball

*Contact Sports"

[9] The 1973 rulebook, published by MIAA's predecessor organization, included a rule that "No boy shall participate on a girls' team in interscholastic athletics. No girl shall participate on a boys' team in interscholastic athletics." The 1976 revision produced a three-part rule virtually identical to the Board of Education's rules 6.02, 6.07, and 6.08. See note 6, *supra*.

Some schools proceeded on that basis to admit male students to a "girls' " team where there was no counterpart "boys' " team. As there were no boys' interscholastic softball teams, Newton South High School in spring, 1978, pursuant to rule 17, allowed two male students to play on its girls' team. This provoked the Massachusetts Division of Girls' and Women's Sports to protest to MIAA's predecessor organization, and then, on June 6, 1978, to commence suit against that organization with a view to preventing Newton South from competing in the girls' State softball tournament.[10] With that action pending, MIAA recommended to the Council that a subdivision d be added to rule 17 which would prohibit boys from playing on girls' teams. It was adopted (with a nonsymmetrical clause regarding girls playing on boys' teams), effective July 1, 1978, in the following terms:

"With due regard to protecting the welfare and safety of all students participating in MIAA athletics: 1) No boy may play on a girls' team. 2) A girl may play on a boys' team if that sport is not offered in the school for the girl."[11]

The State Board of Education took the view that rule 17(d)(1) could not stand legally in its blanket form, and the present action eventuated. The state of affairs on which the new rule impinged, and the policing of the rule, are described in the stipulation of the parties. When the rule was announced, Easthampton High School, which had no swimming team for boys, was allowing boys on

[10] Massachusetts Div. of Girls' and Women's Sports *vs.* Massachusetts Secondary School Principals' Ass'n, Civ. No. 78-2982, Middlesex Super Ct. Application for a temporary order restraining Newton South from competing in the girls' State softball tournament was denied. The lawsuit is still pending.

[11] According to the MIAA, attempts were made to meet with the Department of Education, and "only after a good deal of serious thought and discussion," was rule 17(d)(1) promulgated. The plaintiffs dispute this and say "the rule was passed in haste to resolve pending litigation." We need not resolve this quarrel.

the girls' team (the record does not disclose how many boys). There was a similar situation at Pioneer Valley Regional High School in field hockey,[12] and at Amherst Regional, Greenfield, and Northampton high schools in volleyball. The previously all-female David Hale Fanning Trade School in Worcester had then recently admitted forty-eight boys in a total enrollment of 585. As the school could not field teams exclusively for boys, it allowed boys to play on the girls' softball and basketball squads (again, as with other schools, there is no indication of how many boys participated).[13]

In summer and fall of 1978, administrators at Fanning, Greenfield, and the school district encompassing Pioneer Valley requested waiver of the new rule,[14] or of an interpretive memorandum issued by MIAA on October 31 stating that "[s]chools with girls' teams on which a boy or boys participated during any interscholastic competition must record each contest where 17-d-1 was violated as a loss."[15] The waiver requests were denied,[16] and the Green-

---

[12] The record suggests there may also have been a problem at Pioneer in volleyball, as waiver of a penalty for violation of rule 17(d)(1) was requested on behalf of Pioneer for that sport.

[13] The record contains affidavits from three male Fanning students relating either to basketball or tennis.

[14] The Amherst Regional headmaster had earlier requested clarification of the rule. He was informed by the president of his school's athletic league that violation of the rule could occasion official protest by opposing squads, resulting in a forfeit by the coed team. In fact, three volleyball games were ordered forfeited by Amherst and one competing squad refused to come to Amherst to play.

[15] The memorandum added that a losing girls' team could not claim a retroactive victory unless at the time of the encounter it had protested the appearance of males on the opposing squad. (Part II, § 1, rule 22, outlines the procedure for protesting a game.) Thus for some contests two losses would be recorded, one for the actual loser, and one for the team that had broken the rule. In cases where both squads were in violation, two losses would also result.

[16] The defendants argue that MIAA's waiver procedure draws the sting out of the sex discrimination, but the procedure is without stated

field and Pioneer Valley volleyball teams, which would have been eligible for tournament competition on their actual won-lost records, were unable to qualify.[17]

Concluding our statement of the case, we have first to note that the parties agree, and we concur, that rule 17(d)(1) must be viewed as "State action" for legal purposes.[18] Second, we may be permitted the comment that the rule attacks a small problem with heavy artillery. In the general run of cases there has been no difficulty, as "separate but equal" teams accommodate the students of both sexes, and no question is raised in this case about the legality of separate but equal teams.[19] Rule 17(d)(2) accepts that where there is no opportunity for a girl on that basis, she may compete for a place on the boys' team. The converse problem apparently has arisen in only a handful of schools and only where there was a girls' team but no boys' team in a particular sport. There has been no demonstration by those defending rule 17(d)(1) that male participation on girls' teams after 1976 was other than limited or that it involved any serious distortion or disruption.

1. *Prima facie invalidity of a total ban.* In a recent *Opinion of the Justices,* 374 Mass. 836 (1977), we gave our view of a proposed amendment of G. L. c. 76, § 5, which

standards and seems largely discretionary (see note 17, *infra*), and cannot save a rule illegal or unconstitutional in its terms.

[17] The problem at Fanning was resolved by permitting boys to play on teams at nearby Worcester Vocational Technical High School. MIAA had at first prohibited this procedure, viewing it as a violation of another rule (Pt. II, § 2, rule 15) which bars students in vocational schools from playing on high school teams unless they are "candidates for the regular high school diploma." MIAA's change of heart on this matter indicates the uncertainty of the waiver process as any guaranty for boys excluded from girls' teams.

[18] See *Brenden* v. *Independent School Dist. 742,* 477 F.2d 1292, 1295 (8th Cir. 1973); *Mitchell* v. *Louisiana High School Athletic Ass'n,* 430 F.2d 1155, 1157 (5th Cir. 1970); *Oklahoma High School Athletic Ass'n* v. *Bray,* 321 F.2d 269, 272-273 (10th Cir. 1963).

[19] See note 40, *infra.*

would have disallowed all participation of girls with boys on the "contact sports teams" of football and wrestling. The Justices' opinion was that "[t]he enactment of [the proposed bill] would violate art. 106 of the Amendments to the Constitution of the Commonwealth [ERA]. The absolute prohibition in the proposed legislation cannot survive the close scrutiny to which a statutory classification based solely on sex must be subjected. A prohibition of all females from voluntary participation in a particular sport under every possible circumstance serves no compelling State interest." *Id.* at 842. (The Justices reserved the question whether a statute "more limited in its impact" would serve such a State interest; in particular we did not say whether women could be excluded from men's teams in a particular sport if they were provided with equal facilities.) Judging from decisions around the country, we think the view we expressed as to wholesale exclusion of girls from boys' interscholastic teams where no girls' teams were provided would be accepted by the courts in jurisdictions having ERA (see *Darrin* v. *Gould,* 85 Wash. 2d 859 [1975]; *Packel* v. *Pennsylvania Interscholastic Athletic Ass'n,* 18 Pa. Commw. Ct. 45 [1975]),[20] and generally also by courts applying the less emphatic equal protection or due process clauses of State and Federal Constitutions. See *Brenden* v. *Independent School Dist. 742,* 477 F.2d 1292 (8th Cir. 1973); *Morris* v. *Michigan State Bd. of Educ.,* 472 F.2d 1207 (6th Cir. 1973); *Leffel* v. *Wisconsin Interscholastic Athletic Ass'n,* 444 F. Supp, 1117 (E.D. Wis. 1978); *Yellow Springs Exempted*

---

[20] In *Darrin,* the Washington Supreme Court held it a violation of the ERA for the State interscholastic athletic association to bar qualified girls from boys' contact football teams. The court appeared to apply an absolute rule admitting of no classifications by gender with narrow exceptions in the areas of privacy or characteristics unique to one sex. 85 Wash. 2d at 868-872. The *Packel* court, in striking down a rule that banned mixed competition in all sports including football and wrestling, appeared to take a similar view. 18 Pa. Commw. Ct. at 49, 52-53.

*Village School Dist. Bd. of Educ.* v. *Ohio High School Athletic Ass'n,* 443 F. Supp. 753 (S.D. Ohio 1978); *Hoover* v. *Meiklejohn,* 430 F. Supp. 164 (D. Colo. 1977); *Gilpin* v. *Kansas State High School Activities Ass'n, Inc.,* 377 F. Supp. 1233 (D. Kan. 1973); *Reed* v. *Nebraska School Activities Ass'n,* 341 F. Supp. 258 (D. Neb. 1972); *Haas* v. *South Bend Community School Corp.,* 259 Ind. 515 (1972).[21]

The equal protection guaranty and a fortiori an equal rights amendment condemn discrimination on grounds of sex — whether male or female. Thus in an earlier *Opinion of the Justices,* 373 Mass. 883 (1977), we said that a proposed statute intended to bar boys from a "girl officers regiment" at a public high school would be unconstitutional by reference to the ERA (it was invalid, we said, under the equal protection standard of review as well). Discriminations against men as such have been condemned in many cases, for example: *Commonwealth* v. *MacKenzie,* 368 Mass. 613 (1975) (the law could not pun-

---

[21] *Brenden, Morris, Gilpin, Reed,* and *Haas* all struck down, on equal protection grounds, rules barring capable girls from participation on boys' teams in various noncontact sports; *Morris* expressly modified a District Court order enjoining a prohibition of mixed athletics, so that it would not cover contact games "about which in this record there is no case or controversy." 472 F.2d at 1209. *Leffel,* however, invalidated a rule excluding girls from boys' contact sports, unless girls' teams were established. 444 F. Supp. at 1122. These courts were not asked to decide the validity of sex-segregated teams. The *Morris* court noted, however, that recent Michigan legislation permitted girls' entry into noncontact male teams even where a female team was offered.

The court in *Hoover,* while invalidating a rule that prohibited a girl from playing interscholastic soccer, said that the objective of enhancing girls' athletic opportunities might justify exclusion of boys from some sports such as volleyball. 430 F. Supp. at 170. In *Yellow Springs,* by contrast, a rule barring girls from competing with boys in contact sports was struck down on due process grounds even where separate teams existed. Appeal of that decision is pending.

A few early decisions, applying a deferential type of equal protection scrutiny, upheld prohibitions on mixed competition where girls' teams were offered. E.g., *Ritacco* v. *Norwin School Dist.,* 361 F. Supp. 930 (W.D. Pa. 1973); *Bucha* v. *Illinois High School Ass'n,* 351 F. Supp. 69 (N.D. Ill. 1972).

ish unwed fathers, while exempting mothers from punishment for the act of begetting: decision before ERA). *Orr* v. *Orr*, 440 U.S. 268 (1979) (husbands could not be barred from obtaining alimony available in similar circumstances to wives). *Craig* v. *Boren*, 429 U.S. 190 (1976) (impermissible to allow girls to buy 3.2% beer at age eighteen but boys not until age twenty-one). Indeed, even if equal rights provisions could be viewed primarily as a means of eradicating discrimination against women, they tend to protect men as well, because disadvantages suffered by males are often premised on a "romantic paternalism" stigmatizing to women.[22] Although women have been the usual victims of sex discrimination, there are significant exceptions to this generality, for example, legislation imposing harsher criminal penalties on men.[23] In the field of athletics, where opportunities in the past have grossly favored males,[24] it remains the fact that some of the less athletic men have been denied active participation in competitive sports in part because of sex segregation. The prejudice to an individual male is well

---

[22] The quotation appears in *Frontiero* v. *Richardson*, 411 U.S. 677, 684 (1973).

*Muller* v. *Oregon*, 208 U.S. 412 (1908), which upheld protective maximum hour legislation for women, is now viewed by some as stigmatizing in that sense. See Ginsburg, Gender and the Constitution, 44 U. Cinn. L. Rev. 1, 5-6 (1975); Note, Sex Discrimination in High School Athletics, 57 Minn. L. Rev. 339, 343 (1972); Note, Sex Discrimination and Equal Protection: Do We Need a Constitutional Amendment?, 84 Harv. L. Rev. 1499, 1504-1505 (1971).

[23] See *Commonwealth* v. *Butler*, 458 Pa. 289 (1974) (statute provided minimum sentencing for men but not women); *Commonwealth* v. *MacKenzie*, 368 Mass. 613 (1975) (statute punished unwed fathers but not mothers for act of begetting).

[24] See generally E. Gerber, J. Felshin, P. Berlin, & W. Wyrick, eds., The American Woman in Sport (1974); C. Klafs & M. Lyon, The Female Athlete: A Coach's Guide to Conditioning and Training (2d ed. 1978); Gilbert & Williamson, Women in Sport, Sports Illustrated, May 28, 1973, at 88, June 4, 1973, at 44, June 11, 1973, at 60, July 29, 1974, at 28. A note, Sex Discrimination and Intercollegiate Athletics, 61 Iowa L. Rev. 420 (1975), contains exhaustive citations to the relevant literature.

described in a recent opinion holding — on special Federal grounds not urged by the parties herein — that a high school boy should be allowed to compete for a place on the girls' volleyball team, the only one representing the school in interscholastic volleyball.[25]

It may be predicated, then, that the absolute bar to male participation imposed by rule 17(d)(1) — appearing in remarkable contrast to the generally recognized right of girls as stated in rule 17(d)(2) — is prima facie invalid under ERA or our cognate statute barring sex discrimination in the educational sphere.[26] However, the defendants, after an effort to avoid the whole problem by intimating that the prohibition is in reality not sex-based at all (considered at point 3 [a] below), seek to justify it by suggesting that it forwards the important goals of protecting the safety of players (point 3 [b]), and preserving emergent girls' sports programs from feared inundation by male athletes (point 3 [c]). We examine at point 2 the attitude to be taken constitutionally toward such claimed justifications, and particularly a justification in terms of remedying or compensating for an historical injustice.

---

[25] In *Gomes* v. *Rhode Island Interscholastic League,* C.A. No. 79-158 (D.R.I., May 1, 1979), the District Court interpreted a regulation (45 C.F.R. § 86.41[a]-[b] [1978]) promulgated under Title IX of the Education Amendments of 1972 to forbid exclusion of a boy from a girls' volleyball team where no corresponding boys' team existed. A preliminary injunction granted by the District Court against the exclusion was vacated by the Court of Appeals but hearing of the matter there was speeded; the Supreme Court declined to reinstate the preliminary injunction, 441 U.S. 958 (1979), and appeal is pending in the Court of Appeals. It may be noted here that in *Petrie* v. *Illinois High School Ass'n,* No. 78-C-948, (6th Cir. Ct., Champaign County, Ill., Nov. 22, 1978), appeal pending, the court, reading the local ERA as requiring merely that an exclusion be "substantially related to a justifiable concern for the welfare of all students," held against a boy who sought to secure a place on a girls' volleyball team, there being no boys' team. That ruling, like *Gomes,* was confined to the particular situation; it was not concerned with the validity of a general ban.

[26] See note 5, *supra.*

*2. Standard to be applied to attempted justifications.*
We have held under ERA that classifications on the basis
of sex are subject to a degree of constitutional scrutiny
"at least as strict as the scrutiny required by the Four-
teenth Amendment for racial classifications" (*Common-
wealth* v. *King*, 374 Mass. 5, 21 [1977]),[27] and noted that
such classifications are not permissible unless they meet
two conditions: they must "further a demonstrably com-
pelling interest and limit their impact as narrowly as
possible consistent with their legitimate purpose." *Id.* at
28.[28] No compelling State purpose could be identified in
*Opinion of the Justices*, 374 Mass. 836, 842 (1977), to justi-
fy excluding all females from any voluntary participation
with boys in football and wrestling, and a proposed stat-
ute with such a ban was thought invalid on its face. Con-
versely, no State purpose justified banning boys from the
girl officers regiment. *Opinion of the Justices*, 373 Mass.
883, 887 (1977).

We did not confront in either *Opinion* a discrimination
based on sex — now, pursuant to ERA, a category in a
constitutional tier at least as high as race — which could
lay a claim to having a benign or remedial attitude to-
ward the historically oppressed class. That problem we
meet here, in so far as the defendants seek to justify the
disability they want to fasten on male students on the
ground that it is designed to guard the burgeoning athlet-
ic programs for females. Certainly it can be said that no
stigma attaches to the boys who would be shut out; they
are not branded as unworthy to play alongside girls.

*Regents of the Univ. of Cal.* v. *Bakke*, 438 U.S. 265,
287-305, 356-362 (1978), is a point of reference. In the field

[27] In *King* the State prostitution statute was construed as applying
to male as well as female prostitutes in order to avoid violation of ERA
and equal protection guaranties.

[28] We have spoken of "strict scrutiny" as describing the extreme end
of a continuum of constitutional vulnerability. *Marcoux* v. *Attorney
Gen.*, 375 Mass. 63, 65 n.4 (1978).

of race or ethnicity — a program of admission to a State medical school calculated to favor minority applicants — five of the Justices had to consider what if any adjustment of the "strict scrutiny" approach should be made where it was claimed for a discrimination that it constituted "affirmative action" assisting in some degree classes previously disfavored, that it was aimed not at perpetuating inequality but, on the contrary, at eradicating the remains of past discrimination. This was but another way of asking what must be the strength of a justification tendered to overcome the basic abhorrence of classification grounded on race.

One of the Justices in *Bakke* applied an undiminished "strict scrutiny" standard to the case notwithstanding the special justification asserted for the discrimination in favor of minorities. 438 U.S. at 287-305 (Powell, J.).[29] The other four Justices settled on a level of scrutiny that was "strict — not ' "strict" in theory and fatal in fact,' because it is stigma that causes fatality — but strict and searching nonetheless." *Id.* at 362 (Brennan, White, Marshall, and Blackmun, JJ.).[30] At another place in that joint opinion, the Justices spoke of whether the classification "serve[d]

---

[29] Justice Powell found the goal of a diverse student body — a goal emanating from the First Amendment — to be compelling, but he held that the University went to an unnecessary extreme in reserving a specific number of places for members of particular ethnic groups.

[30] The "fatal in fact" quotation was from Gunther, The Supreme Court 1971 Term — Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv. L. Rev. 1, 8 (1972). The Supreme Court, applying strict scrutiny to a suspect classification, has upheld use of such a classification in but one historical context. *Korematsu* v. *United States*, 323 U.S. 214, 218-219 (1944). See *Commonwealth* v. *King*, *supra* at 21 n.12.

These four Justices would have accepted the university's plan in *Bakke* with its numerical feature. The ultimate decision of the Court was otherwise, as four Justices (Stevens, J., with whom Burger, C.J., Stewart, and Rehnquist, JJ., joined) voted with Justice Powell, but on the ground that Title VI of the Civil Rights Act of 1964 prohibited exclusion from federally-funded programs on grounds of race, 438 U.S. at 408.

important governmental objectives and [was] substantially related to achievement of those objectives" (*id.* at 359), a level of inquiry borrowed from equal protection decisions in the realm of gender. See *Califano* v. *Webster*, 430 U.S. 313, 317 (1977); *Craig* v. *Boren*, 429 U.S. 190, 197 (1976).[31] This somewhat relaxed standard would still call for a judgment whether the discrimination served an important public purpose and, if so, whether it was proportioned to that purpose and did not result in excessive inequality. The latest expression by the Court on the justification that would be needed to sustain a sex preference indeed says it must be "exceedingly persuasive." *Personnel Adm'r of Mass.* v. *Feeney*, 442 U.S. 256, 273 (1979). It is a notable fact, too, that the Court has not intimated that it would apply any lowered standard of review to cases of discrimination explicitly based on sex merely because a remedial or benign explanation was offered.[32]

Conceivably an MIAA rule might be so nicely drawn with attention to purpose and scope that a choice among standards might become critical in deciding the rule's validity. But precise election among standards may not be of the essence here, where we confront an absolute prohibition of a boy's joining a girls' team in any sport and under any conditions. We doubt that such a rule could be sustained under any mentioned approach, or variant.[33] Cf. *Opinion of the Justices,* 373 Mass. 883, 887

---

[31] Justice Powell, in a part of his opinion concurred in by these four Justices, also referred to "a substantial interest that legitimately may be served by a properly devised admissions program." *Id.* at 320.

[32] See, e.g., *Califano* v. *Webster*, 430 U.S. 313, 317 (1977); *Weinberger* v. *Wiesenfeld*, 420 U.S. 636, 648-653 (1975). Distinguishing "remedial" from invidious classifications in the context of sex is peculiarly difficult because of the likelihood that benign purposes may inadvertently perpetuate outmoded stereotypes. See *Orr* v. *Orr*, 440 U.S. 268, 283 (1979) (classifications by gender carry "inherent risk of reinforcing stereotypes about the 'proper place' of women and their need for special protection").

[33] See the multifactored approach of Justice Marshall in *Dunn* v.

(1977). Least of all may it be sustained in the Common-wealth with a specifically directed ERA, not simply a general equal protection guaranty. Under ERA it is espe-cially fitting, and, we think, required, that any purported justification for a classification based on sex, even one claimed to involve "affirmative action," should be weighed with great care.

3. *Purported justifications.* (a) *Sex as a "proxy" for func-tion.* The defendants seem to suggest in the course of their argument that the discrimination under attack is in real-ity not one based on sex but rather on functional differ-ences deriving in the main from biology, and is thus not proscribed by the ERA. No doubt biological circumstance does contribute to some over-all male advantages. But we think the differences are not so clear or uniform as to justify a rule in which sex is sought to be used as a kind of "proxy" for a functional classification. See *Caban* v. *Mohammed,* 441 U.S. 380, 389-391 (1979), and the dissent of Justice Stevens at 403-408; *Orr* v. *Orr,* 440 U.S. 268, 281-283 (1979).

Our point is illustrated by *Commonwealth* v. *MacKen-zie, supra.* There the court struck down a criminal statute that punished fathers but not mothers for begetting chil-dren out of wedlock; but we upheld the part of the law designed to establish paternity and the obligation of child support because it reflected functional differences, bio-logically based, between males and females: childbearing renders obvious the identity of the mother, while the father may easily escape recognition. The classification was "more than ... sex-based." It reflected "significant

---

*Blumstein,* 405 U.S. 330, 335 (1972), noted with approval by some courts assessing sex-based sports discriminations. E.g., *Brenden* v. *In-dependent School Dist. 742, supra* at 1296; *Hoover* v. *Meiklejohn,* 430 F. Supp. 164, 167-169 (D. Colo. 1977); *Gilpin* v. *Kansas State High School Activities Ass'n,* 377 F. Supp. 1233, 1239 (D. Kan. 1973). The approach is elaborated in Wilkinson, The Supreme Court, the Equal Protection Clause, and the Three Faces of Constitutional Equality, 61 Va. L. Rev. 945, 991 (1975). See also *Marcoux* v. *Attorney Gen., supra.*

circumstantial differences between the fathers and the mothers of illegitimate children"; its scheme did not rely on " 'archaic and overbroad generalizations, but, instead, the demonstrable fact that male and female . . . [parents of illegitimate children] are *not* similarly situated.' " *Id.* at 617-618, quoting in part from *Schlesinger* v. *Ballard,* 419 U.S. 498, 508 (1975) (emphasis in original).

*MacKenzie* suggests that if all high school boys outstripped all high school girls in all athletic endeavors, total separation might be justifiable; the line would be drawn in truth between students in different ability-groups. But this hardly resembles the situation in athletics today (as, indeed, rule 17[d][2] itself seems to recognize), and it becomes every day less descriptive of it.

The general male athletic superiority based on physical features[34] is challenged by the development in increasing numbers of female athletes whose abilities exceed those of most men, and in some cases approach those of the most talented men.[35] Coordination, concentration, strategic acumen, and technique or form (capabilities of both sexes) intermix with strength and speed (where males have some biologic advantages) to produce athletic results. Cf. *Brenden* v. *Independent School Dist. 742,* 477 F.2d 1292, 1300 (8th Cir. 1973). Classification on strict grounds of sex, without reference to actual skill differen-

---

[34] Such as larger muscle mass, higher proportion of lean body tissue, greater cardiovascular capacity, and greater height. See generally Gerber et al., *supra* at 412-484; Klafs & Lyon, *supra* at 15-42.

Women may, however, have an edge in sports that test balance, since their average lower center of gravity augments stability. They retain heat longer and enjoy far greater buoyancy than men — both advantages in swimming. Klafs & Lyon, *supra* at 15-17. There is also evidence of higher endurance levels, and lower injury rates, for females. Rose, The ERA and Women's Sport: An Hypothetical Trial Case, in C. A. Oglesby, Women and Sport: From Myth to Reality 239-241 (1978).

[35] See Klafs & Lyon, *supra* at 24; Rose, *supra* at 238; *Yellow Springs Exempted Village School Dist. Bd. of Educ.* v. *Ohio High School Athletic Ass'n,* 443 F. Supp. 753, 758 (S.D. Ohio 1978) ("Babe Didrikson could have made anybody's team").

tials in particular sports, would merely echo "archaic and overbroad generalizations." *Schlesinger* v. *Ballard, supra.*

Thus rule 17(d)(1) must be taken to be the intentional use of sex as a discriminant, a practice forbidden by ERA unless somehow excused or justified.

(b) *Safety.* The defendants argue that the gender-based absolute exclusion is necessary to achieve an important State interest, protection of players' safety. Indeed, "protecting the . . . safety of all students" appears in the preamble of the rule (in company with the vague term "welfare") as the rule's objective. It may be enough to say — as the plaintiffs do — that the defendants have not satisfied their burden of supporting the claim with facts. See *Bakke, supra,* 438 U.S. at 305, 320. Nevertheless we analyze the claim by reference to law and common sense.

The defendants' argument on the score of safety or health was implicitly rejected in *Opinion of the Justices,* 374 Mass. 836 (1977), where the proposed ban on girls' participation in football and wrestling was considered invalid. A girl is surely not less exposed to injury as a member of a predominantly male team, than as one of a team predominantly female but with some male players. In any case, a girl is entitled as much as a boy to choose to take a risk, subject always to safety rules and appropriate supervision and equipment. As was said in *Hoover* v. *Meiklejohn, supra,* 430 F. Supp. at 169, where it was held that considerations of safety did not justify excluding a qualified girl from a soccer team in interscholastic competition: "Any notion that young women are so inherently weak, delicate or physically inadequate that the state must protect them from the folly of participation in vigorous athletics is a cultural anachronism unrelated to reality."

The defendants offer in their brief a statement by a medical advisor (there is no citation to a publication) that attempts a connection between the presence of male athletes on a team with injury to females. It is replete with

stereotypical assumptions and generalities. Cf. *Fortin* v. *Darlington Little League, Inc.*, 514 F.2d 344, 349-350 (1st Cir. 1975) (rejecting medical testimony intermixing cultural with physical observation). But if we were to indulge an assumption of such a relationship in the rougher sports, what of golf, gymnastics, riflery, skiing, track, cross-country running, swimming, tennis? Risks are not constant. Under ERA, a sex-based exclusion must show a closer "fit" than this.

(c) *Protection of girls' participation in sports.* Although the preamble seems otherwise directed, the prohibition of rule 17(d)(1) is now sought to be justified as a measure of "affirmative action" needed, so it is alleged, to prevent the swamping of girls' teams by boys of skill and prowess superior to those of girls. But the rule is out of proportion to any looming danger. It represents a sweeping use of a disfavored classification when less offensive and better calculated alternatives appear to exist and have not been attempted.[36]

We neither know, nor are apprised by the record, that the apprehended peril is such as to require so sweeping a prohibition.[37] But even if the claimed fear of inundation

_____

[36] For an exhaustive analysis of "less restrictive alternatives," see Note, Equal Protection: A Closer Look at Closer Scrutiny, 76 Mich. L. Rev. 771, 871-881 (1978).

[37] The record regarding the pre-rule 17(d)(1) period leaves us without precise information as to the number of boys who played on teams that were disqualified from tournament competition, or on other teams mentioned in the stipulation, but we may fairly assume that it was not overwhelming. The information we do have indicates there were two boys on the Newton South softball team. Affidavits from three boys at the Fanning Trade School showed their interest in basketball and tennis, and the school's director wrote that she expected only a few boys would try out. Of course, in relation to the whole student population in secondary schools affiliated with MIAA, the incidents and numbers of male players reflected in the record are minimal.

On the other hand, the exclusionary effects of such a rule as 17(d)(1) are not trivial. So far as the rule excludes males from any joinder in such a sport as field hockey or softball, it operates with peculiar hardship upon boys whose interest or ability leads there. In contrast

because of male advantages in many sports were more solidly based in fact, it would not justify the categorical exclusion of males from any sport, or divisions or "events" of a sport, in which, over-all, they enjoy no or only a slight advantage over females. Gymnastics and swimming (as well as riflery) may be examples.[38]

No less important is the fact that the rule overlooks approaches, short of broad prohibition, that could solve any anticipated problem of boys in substantial numbers displacing girls from competition to the serious detriment of the development of athletics for girls. Use of standards focusing on height, weight, or skill rather than solely on gender represents one such approach: males would thus be admitted who could not dominate the mixed teams or overwhelm the opposition.[39] Admission could perhaps be regulated by handicapping in a sport like golf. On another level also, lesser measures than complete exclusion suggest themselves. Where boys' teams were not feasible, admission of boys to girls' teams could be limited, not to exceed reasonable numbers. In particular situations, rotating systems might be adopted by which qualified boys were admitted but only a certain number could play in a given game.

We emphasize that resort to a separate team for boys acts as a backstop for many if not all alternatives which result in introducing boys into girls' teams. That is to say, if enough boys are interested in a sport to try out for, and threaten to oust girl players from, a particular team, the school authorities are on notice that a boys' team may be

to various sports common to boys and girls from which the rule would exclude boys only if their school had no boys' teams, in the sports named the rule means no possibility of male participation although for some boys there may be no other avenue to competitive athletics.

[38] The point would apply to several other sports not now "recognized" by MIAA. The defendants' brief suggests that recognition follows as of course when sufficient interest is shown.

[39] In the *Gomes* situation, *supra*, the male plaintiff was graded sixth to ninth in skill on the "girls'" volleyball team.

in order. Should the number of boys be not quite enough for a separate squad, the problem would sometimes be amenable to solution by forming a consolidated boys' team representing neighboring schools (see n.17). As noted earlier, the legality of segregation in separate but equal teams is not challenged here.[40]

We do not overlook the difficulties in maintaining fair competition when mixed teams enter the lists, but it would be premature to assume that the difficulties are insurmountable. That assumption might itself stem from stereotypes which ERA rejects. Some of the mixed teams will have been so constituted in the first place that they will compete with no advantage. Handicapping as well as selective pairing of teams may be feasible for other cases. During a period of experimentation and change, some unevenness in the competition may result, but that calls merely for a modicum of toleration and some imaginative willingness to try new combinations.

Our mention of alternative patterns is intended merely to throw light on the question of the constitutional validity of the Draconian choice made by the defendants.[41] We acknowledge very freely that the defendants are far abler than ourselves to decide what means they need to adopt

---

[40] See B. Brown, A. Freedman, H. Katz & A. Price, Women's Rights and the Law 304-308 (1977); Jewitt, The Equal Rights Amendment and Athletics, 1 Harv. Women's L.J. 53, 71-79 (1978); Comment, Sex Discrimination in Interscholastic High School Athletics, 25 Syracuse L. Rev. 535, 556-558 (1974). Cf. *Yellow Springs Exempted Village School Dist. Bd. of Educ., supra* at 758.

On "separate but equal" in the area of gender generally, see *Vorchheimer* v. *School Dist. of Philadelphia*, 532 F.2d 880 (3d Cir. 1976), aff'd by an equally divided court, 430 U.S. 703 (1977); Comment, Plessy Revived: The Separate but Equal Doctrine and Sex-Segregated Education, 12 Harv. C.R.-C.L.L. Rev. 585 (1977).

[41] The alternatives mentioned do not depart materially from conventional ideas of competitive athletics. There is a literature describing other, more innovative modes. See, e.g., Comment, Equality in Athletics: The Cheerleader v. The Athlete, 19 S.D.L. Rev. 428, 444-445 (1974); Comment, 25 Syracuse L. Rev., *supra* at 562-566; Gerber at al., *supra* at 241.

to promote athletics, and girls' athletics in particular, once the constitutional limits have been set down. As Justice Blackmun said in *Bakke*: "The administration and management of educational institutions are beyond the competence of judges and are within the special competence of educators, provided always that the educators perform within legal and constitutional bounds." 438 U.S. at 404.

4. *Summing Up*. The State Board of Education, through the Attorney General, has rightly questioned a rule of the MIAA which would bar boys from playing on girls' interscholastic teams—an absolute rule applying by its terms even when no comparable boys' team exists. Any rule which classifies by sex alone is subject to close examination under the concept of equal protection of the laws, as that has been strengthened by the popularly adopted ERA and the statute on educational opportunity. Upon such examination, no current situation confronting MIAA has been pointed to that would warrant so drastic a rule of exclusion. An alleged "safety" justification for the prohibition must fail. A further justification alleged was that, without a total ban on all participation by boys, girls' sports would be overrun by boys who as a class are physically better equipped for athletic competition. Undoubtedly there is a problem here which is entitled to sympathetic consideration and to the extent necessary may even call for "affirmative action." On analysis, however, it appeared that the problem was marginal; where it arises, it can be met by measures less offensive and less sweeping than a complete sex barrier.

It can be expected that the present decision will make little practical difference in the traditional conduct of interscholastic athletic competition, for that will proceed in the great majority of instances on a basis of "separate but equal" teams whose validity is assumed here. We do not believe our decision will interfere with the development of competitive athletics for girls. On the contrary, to immunize girls' teams totally from any possible con-

tact with boys might well perpetuate a psychology of "romantic paternalism" inconsistent with such development and hurtful to it in the long run.

The present decision is addressed to the facts as they now appear. We acknowledge that future changes in the situation, not now perceptible, may call hereafter for a different solution.

The case will be remitted to the single justice for the entry of judgment declaring rule 17(d)(1) to be invalid and appropriately enjoining its application.

*So ordered.*