**Charlotte STRIEBEL, State of Minnesota, by William L. Wilson, Commissioner, Department of Human Rights, Appellants,**

v.

**The MINNESOTA STATE HIGH SCHOOL LEAGUE, Respondent.**

Nos. 51940, 52042.

Supreme Court of Minnesota.

July 9, 1982.

Rehearing Denied Sept. 10, 1982.

Diane C. Hanson, MCLU, Linda Ojala, MCLU, Minneapolis, for Striebel.

Warren Spannaus, Atty. Gen., Mark Levinger and Richard Varco, Sp. Asst. Attys. Gen., St. Paul, for State.

Talle, Klint & Trimble and Douglas E. Klint, Anoka, for respondent.

Peterson, Popovich, Knutson & Flynn, Peter S. Popovich and Frances H. Graham, St. Paul, amicus curiae for Minnesota School Boards Ass'n.

OTIS, Justice.

Appellant Striebel challenges, on equal protection grounds, the constitutionality of Minn.Stat. § 126.21, subd. 5 (1980), authorizing separate seasons of play for high school athletic teams separated or substantially separated according to sex. The trial court determined that the lack of adequate tennis and swimming facilities made it necessary to schedule these sports in two seasons, and that separating the teams by sex was a reasonable means of achieving maximum participation by both sexes in the high school athletic program. It concluded that the policy of the Minnesota State High School League (MSHSL) establishing separate seasons for boys and girls in tennis and swimming is constitutional and in compliance both with Minn.Stat. § 126.21 (1978), and as amended by Act of March 18, 1980, c. 355, 1980 Minn.Laws 40. We hold that under the narrow factual circumstances presented, the scheduling policies of the MSHSL do not rise to the level of a constitutional violation. We therefore need not decide the issue of the constitutionality of the statute.

A short history of previous litigation on this matter may be helpful. In *Striebel, et al. v. St. Paul Board of Education, et al.*, (Ramsey County Dist.Ct., No. 397836, July 9, 1976), the plaintiffs alleged sex discrimination in the St. Paul school athletic programs. Interpreting the language of Minn. Stat. § 126.21 (1978) the court found that separate seasons were impermissible unless shown to be necessary to provide equal opportunity for both sexes to participate in athletics. Pursuant to that decision the St. Paul school board established a program for combined seasons for boys and girls participating in swimming and tennis, the effect of which was to exclude male swimmers and female tennis players from participation in state tournaments. After parents of several male swimmers and female tennis players sued to restrain the proposed season change, the St. Paul Board of Education was enjoined from combining seasons and ordered to set the swimming and tennis seasons to conform with the dates set by the MSHSL. *Stumpf v. St. Paul Board of Education* (Ramsey County Dist.Ct. No. 421814, August 25, 1977). Appellant Striebel intervened in that action and filed a third party complaint against respondent. The original action was dismissed prior to trial.

Minn.Stat. § 126.21 (1978) was amended after the close of the trial and permits the scheduling practices at issue.

The Minnesota State High School League was established in 1916 as a voluntary collection of Minnesota schools for the promotion of amateur sports. The majority of Minnesota public and private schools are members. The League establishes playing seasons for various sports and arranges tournaments at the state level when enough schools have demonstrated an interest. Girls' athletics came within the scope of the League's activities around 1969, and since then the program has grown enormously.

The first state girls' tennis tournament was held in the fall of 1974, and girls' state swimming meets were initiated in the fall of 1975. State tennis tournaments for boys began in 1929, and have traditionally been held in the spring. Boys' swimming meets have been held since 1930, traditionally scheduled in the winter. The MSHSL sponsors state tennis and swimming tourna-

ments for the girls' teams in the fall, a state swimming tournament for boys in the winter, and a state tennis tournament for boys in the spring. The League presently sponsors four tournaments in a coed format: skiing, track, cross-country and golf. A coed tournament means that the state meet is scheduled in the same season for both sexes and the boys' and girls' events are alternated. In the actual competition girls compete against girls and boys compete against boys.

Minn.Stat. § 126.21 (1980) does not prohibit co-educational teams. Where two teams in one sport are provided, one of the teams may be restricted to "members of a sex whose overall athletic opportunities have previously been limited." *Id.*, subd. 3(4). This will generally mean that there will be one team restricted to girls only;[1] the other team is open to members of both sexes.

■ 1. It is a basic principle of constitutional law that courts will avoid any constitutional question except with reference to the particular facts to which it is to be applied. *See e.g., Alabama State Federation of Labor v. McAdory*, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945). With this principle in mind, it should be made clear what this court does not decide. We do not hold that it would be constitutionally permissible to have separate seasons were adequate facilities available.[2] The evidence was uncontroverted that access to pool and tennis courts was limited in many high schools and no feasible way to accommodate boys' and girls' teams in the same season existed. The solution to this problem is an administrative decision uniquely within the competence of educators. *Regents of University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *Attorney General v. Massachusetts Interscholastic Athletic Association*, 378 Mass. 342, 393 N.E.2d 284 (Mass.1979).

Appellant contends that alternative methods existed for dividing athletes between two seasons. We recognize that neither the solution chosen by the MSHSL nor the alternatives espoused by appellant are without disadvantages. Experts testified to the harmful effects of sex segregation on women and men in their work and social relationships, and on women's economic status and later career development. Respondent's assertion that girls are not disadvantaged, because they have the opportunity to compete on the boys' teams in the spring and fall tournaments, is not dispositive of the issue. Appellant does not seek coeducational teams, acknowledging that physiological differences among men and women make separate teams necessary for the time being to provide girls with equal athletic opportunity. That being the case, it should be noted that treatment of the separate teams must be as nearly equal as possible, and separation allowed only to the extent absolutely necessary to provide equal athletic opportunity for all participants.

Appellant has not suggested that the teams are treated unequally in any way regarding length of seasons, game rules, coaching, or money spent on the programs. The only allegation is that girls' teams are placed in a separate season. While we could not condone a solution which benefited boys at the expense of the more recent girls' programs, neither season is so substantially better than the other as to deny equal protection of the laws.

■ We hold that under the limited factual situation presented, the practice of scheduling two teams substantially separated according to sex is a permissible scheduling decision for the MSHSL to make. While we concur in the argument that coeducational athletic programs are preferable

---

1. *Contra, Gomes v. Rhode Island Interscholastic League*, 469 F.Supp. 659 (D.R.I.), *vacated on other grounds*, 604 F.2d 733 (1st Cir. 1979) (interpreting the phrase "athletic opportunities for members of that sex [which] have previously been limited" in regard to the particular sport and team in question rather than overall

athletic opportunities for the sex). *Id.* at 663–64.

2. The question of whether "separate but equal" teams could withstand constitutional scrutiny is not before us, and such a decision is unnecessary to an adjudication of this action.

to sex-segregated programs, respondent is not constitutionally compelled to offer a gender-neutral two season format.

The State appeals separately from that part of the order below requiring it to pay the cost of a trial transcript, ordered by respondent to use in preparation of the post-trial brief, and the cost of copies of four discovery depositions not used at trial.

2. Although no case in this jurisdiction has discussed the award of costs of the transcript used to prepare post-trial briefs, the law is well-settled that amounts paid for the transcript for the purpose of making a motion for a new trial are not taxable to the other party. *See Wadleigh v. Duluth Street Railway Co.*, 92 Minn. 415, 100 N.W. 362 (1904). In *Salo v. Duluth and Iron Range Railroad Co.*, 124 Minn. 361, 145 N.W. 114 (1914), this court held that the cost of a trial transcript obtained daily for the convenience of the attorney during trial is not a taxable disbursement. "If we rule as plaintiff desires on this point, we may look for a transcript to tax in almost every case tried." *Id.* at 364, 145 N.W. at 115. The policy reasons stated in *Salo* were cited with approval in *Miller v. Commissioner of Taxation*, 242 Minn. 29, 64 N.W.2d 1 (1954), where we held that the costs incurred in obtaining a transcript for use before the board of tax appeals were not taxable against the losing party. We therefore reverse that portion of the trial court's order which awards the costs of the transcript to respondent.

As no Minnesota case dealing with deposition costs appears to be on point, the trial court was free to determine whether the deposition costs were "necessary" items under Minn.Stat. § 549.04 (1980). The award of costs of the copies of the discovery depositions being within the discretion of the trial court, it will not be reversed except for a clear abuse of discretion. *Romain v. Pebble Creek Partners*, 310 N.W.2d 118, 123–24 (Minn.1981). We affirm the award of discovery costs.

Reversed in part, affirmed in part.

WAHL, Justice (dissenting in part).

I respectfully dissent from the holding in Case No. 51940.

Minn.Stat. § 126.21, subd. 5 (1980), permitting athletic competition or tournaments to be assigned to seasons that are separate on the basis of sex, allows a classification based solely upon gender and thus triggers review under the Equal Protection Clause of the 14th Amendment of the United States Constitution. *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). That clause guarantees that "[n]o state shall * * * deny to any person within its jurisdiction the equal protection of the laws." In scheduling separate but equal seasons of play and tournaments in tennis and swimming for its member schools, the League acts under the color of state law. *See Brenden v. Independent School 742*, 477 F.2d 1292, 1295 (8th Cir. 1973). Therefore, the court must carefully scrutinize this gender-based classification.

The United States Supreme Court has determined that "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976). Administrative ease and convenience are not sufficiently important objectives to justify gender-based classifications. *Id.* at 198, 97 S.Ct. at 457.

The appellant argues, and the majority concurs in the argument, that coeducational athletic programs are preferable to sex-segregated programs. The majority specifically does *not* hold that it would be constitutionally permissible to have separate seasons where adequate facilities are available. The decision turns on the adequacy of the facilities.

The majority accepts the League's contention that the boys' and girls' swimming and tennis tournaments must be scheduled separately because many of its member schools do not have enough pools and tennis courts to accommodate in one season all the boys and girls who wish to participate in those sports. Maximum participation by both girls and boys in swimming and tennis

is an important objective. The League has not demonstrated, however, that scheduling separate seasons is the only feasible way to achieve that objective. It was clear from the evidence that adequacy of facilities, as far as seasonal practice and play are concerned, is no problem in out-state schools and, for swimming in particular, is no problem in the metropolitan area. Iron Range schools participated in the earlier, 1924–1942, period of swimming and operated their boys' and girls' programs in the same season. Even in the metropolitan area, St. Paul athletic director Wayne Gilliland reluctantly admitted, "I guess I always would believe that swimming probably was a possibility * * * because we do have the pools." Availability of tennis courts is considered by Dr. James Phillips, an assistant superintendent, to be an administrative problem which is solvable by leasing courts if necessary. Facilities management is also crucial. Essentially the same court facilities were used by the St. Paul Highland Park coach to handle 12 to 15 tennis players and by the St. Paul Johnson coach to handle 36 to 50 tennis players. It appears that, even as far as the boys are concerned, participation is limited more by lack of assistant coaches than by lack of ability to schedule existing facilities to accommodate more participants.

Further, the League has not demonstrated that the division of swimming and tennis tournaments by gender is substantially related to its objective of assuring the availability of tennis and swimming to as many students as possible or necessitated by inadequate facilities. Jean Freeman, A. A. U. coach and head coach of the women's swimming team at the University of Minnesota, who had extensive experience in conducting coed meets, gave detailed proposals for running a coed swimming tournament. A state coed tennis tournament is also feasible. The number of courts and time needed for such a tournament can be kept the same by playing more rounds outstate at the regional level before players advance to the state level. Under the separate-season format, only one round is played outstate. The League does have the ability to make such adjustments and changes. As appellant notes, the League completely changed the format of its tennis tournaments when it divided schools into A and AA classes. This change doubled the size of the tournaments and was made expressly to increase participation.

Segregation by gender has an adverse effect on girls' tennis and swimming. Because boys' tennis has traditionally been scheduled in the spring, girls' tennis is relegated to the fall season. The results are that girls must begin their tennis season before the school year begins and that their season may be cut short by early winter weather. The boys do not suffer these disadvantages. New, less-experienced coaches are also more likely to be assigned to the girls' teams. According to statistics supplied by the Athletic Department of the St. Paul Public Schools, the average experience of coaches assigned to boys is 8.1 years; the average experience of coaches assigned to girls is 4.5 years.

More importantly, segregation by gender has long-term adverse effects. Experts such as psychologist Dorothy Loeffler and Nina Rothchild, executive director of the Council on the Economic Status of Women, testified at trial that sex segregation in athletic programs contributes materially to the failure of both men and women to work together in career situations, as well as to occupational sex segregation and the lower economic status of women. Sex bias does exist in the schools and, according to Dr. Phillips, coed athletic activities serve to reduce this bias.

Schools with adequate facilities or the will to use their facilities and resources creatively who wish to reduce sex bias by providing coeducation in swimming and tennis will be unable to do so. They are forced into separate seasons by the League's sex-based assignment of separate seasons. This classification serves no important governmental interest on a statewide basis and cannot be upheld under the *Craig v. Boren* constitutional standard relating to gender-based discrimination.

I would reverse.

TODD, Justice (dissenting).
I join in the dissent of Justice Wahl.

YETKA, Justice (dissenting).
I join in the dissent of Justice Wahl.

SCOTT, Justice (dissenting).
I join in the dissent of Justice Wahl.